WILLARD H. ALLEN, SECRETARY OF AGRICULTURE OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. COMMERCIAL CASUALTY INSURANCE COMPANY, DEFENDANT-RESPONDENT.

Submitted February 11, 1944—Decided April 13, 1944.

476

For the appellant, *Edward W. Currie,* Assistant Attorney-General.

For the respondent, *Lum, Fairlie & Wachenfeld* (*Charles S. Barrett,* of counsel).

The opinion of the court was delivered by

PERSKIE, J. The questions requiring decision on the appeal and cross-appeal from the judgment entered in the Supreme Court stem from an action by the Secretary of Agriculture against the surety on a bond filed pursuant to statute by a licensed purchaser of milk. *R. S.* 4:12–1, *et seq.*

The facts which give rise to these questions were submitted to the learned trial judge (the late Judge Palmer) without a jury on an agreed state of facts.

From the facts so stipulated, and the record submitted, we learn that Elmer Kleppinger, trading as Farmer's Exchange Company, having complied with the statutory requirements (*R. S.* 4:12–2 to *R. S.* 4:12–4), was granted a license, by our Secretary of Agriculture, plaintiff below, entitling Kleppinger to conduct the business of buying milk from producers of this state at his station or place at Belle Mead, New Jersey, for the period commencing July 1st, 1939, and ending on June 30th, 1940. *R. S.* 4:12–5.

By one of the requirements of the statute, Kleppinger was obliged to file with the Secretary of Agriculture a surety bond in a sum not less than one and one-half times his estimated monthly "indebtedness * * * to the persons from whom he may purchase * * * milk * * *." 4:12–4. He filed such a bond in the sum of $5,000, and the Commercial Casualty Insurance Company, a corporation of this state, defendant below, became surety thereon.

Kleppinger bought milk from the producers in this state but defaulted in his payments for his purchases. Claims were filed with the Secretary of Agriculture by some thirty-nine producers pursuant to statute totaling $7,013.49. *R. S.* 4:12–7. The claims were audited by the Secretary of Agriculture who demanded the full amount of the bond from the surety company. *R. S.* 4:12–8.

The defendant surety company refused to pay anything on account of the claims of the thirteen producers, whose claims totaled $2,809.69, upon the ground that they had executed an indemnity agreement with it under the terms of which these claimants agreed "At all times [to] indemnify" it "and to hold and save it harmless from and against any and all liability, damages, loss * * *." Fourteen additional producers signed the indemnity agreement, but they filed no claims with the Secretary of Agriculture.

The defendant surety company likewise refused to pay in full the claims of those who did not sign this indemnity agreement, whose claims totaled $4,203.80; it is, and was, willing to pay them the percentage (.71291%) which $5,000 —the amount of the bond—bears to $7,013.49—the total amount of all claims—i. e., it is willing to pay them .71291% of $4,203.80, which amounts to $2,996.94.

Upon these facts, the late Judge Palmer determined that the indemnity agreement was not illegal and void, as urged by the Secretary of Agriculture, as contravening public policy; and that the Secretary of Agriculture was entitled to the full amount of the bond plus interest, viz., $5,495.75, which sum he was directed to distribute in accordance with the provisions of the statute, R. S. 4:12–8.

Neither side is satisfied. The plaintiff, Secretary of Agriculture, appeals from the determination that the indemnity agreement did not contravene public policy and the defendant surety company appeals from the determination that it is liable for the full amount of its bond rather than the amount which it claimed ($2,996.94) was due thereon.

1. We too are of the mind that the indemnity agreement was not contrary to public policy.

Much has been written by text writers and by the courts as to the meaning of the phrase "public policy." All are agreed that its meaning is as "variable" as it is "vague," and that there is no absolute rule by which courts may determine what contracts contravene the public policy of the state. The rule of law, most generally stated, is that "public policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the

public or against public good * * *" even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case. .

The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating· to and affecting the safety, health, morals and general welfare of the people for whom government—with us—is factually established. *Cf. Brooks* v. *Cooper,* 50 *N. J. Eq.* 761, 767, *et seq.;* 26 *Atl. Rep.* 978; 21 *L. R. A.* 617; *Driver* v. *Smith,* 89 *N. J. Eq.* 339, 359; 104 *Atl. Rep.* 717; *Twin City Pipe Line Co.* v. *Harding Glass Co.,* 283 *U. S.* 353, 357; 75 *L. Ed.* 1112, 1116; 17 *C. J.* 563, *et seq.,* §§ 211 (*a*) and (*b*); 6 *R. C. L.* 707, §§ 114, *et seq.*

From information so obtained certain principles come into play in determining whether a contract contravenes public policy. Men of "full age and competent understanding" have the "utmost liberty of contracting." Contracts so freely and voluntarily made, in the absence of express or implied prohibition, are sacred and are enforced by courts of justice. And courts do "not lightly interfere with this freedom of contract." Lord Jessel, in *Printing Registering Co.* v. *Sampson,* 19 *Eq.* 462, 465; 21 *E. R. Co.* 696, 699 (cited in *Driver* v. *Smith, supra* (at *p.* 359). Or in the words of the late Mr. Justice Butler, "The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which the doctrine rests." *Twin City Pipe Line Co.* v. *Harding Glass Co., supra,* 283 *U. S.* 353 (at *p.* 356); 75 *L. Ed.* 1116.

With these principles in mind, we have read the applicable provisions of *R. S.* 4:12–1, *et seq.,* in vain to find any express or implied prohibition therein against producers becoming sureties under the circumstances exhibited. Conceding that the act (*R. S.* 4:12–1, *et seq.*), was enacted for the reasons

set down in the statement when in form of a bill, namely, "to protect milk producers from loss by reason of the failure of milk buyers and dealers to meet their obligations through fraud or otherwise," we hold that those who signed the indemnity agreement did not thereby lose the benefits of the act even though by so doing each contracted an independent obligation with defendant surety company. This it would appear they had a legal right to do. And there is no proof that in freely and understandingly exercising that right the public was particularly interested or concerned, or that the resulting contract was likely to be injurious to the public or be against public good. The claims of the indemnitors, as producers, were part of "all claims" and thus were subject to the protection of the bond furnished by defendant surety company just as the claims of the producers who did not sign the indemnity agreement were subject thereto. *R. S.* 4:12–9. The Secretary of Agriculture properly so treated them in reaching the total ($7,013.49) of Kleppinger's default and the defendant surety company likewise so treated them in determining the ratio (.71291%) due to them on their claims.

2. It was not error for the trial judge to have found a verdict in the penal sum of the bond plus interest and costs. *R. S.* 2:70–3; *Cf. Summit* v. *Morris Traction Co.,* 85 *N. J. L.* 193, 196; 88 *Atl. Rep.* 1048; *L. R. A.* 1915E, 385. The Secretary of Agriculture is, of course, no party to the indemnity agreement. He is obliged to make "distributions to the claimants in accordance with the proofs filed, either ratably, or in full, as the case may be." *R. S.* 4:12–8. The claims of the indemnitors are also entitled to be paid the same ratio (.71291%) as paid to those who did not sign the indemnity agreement.

If the defendant surety company is apprehensive as to its ability to lay hold of the moneys due to the thirteen claimants once the sum due them is included in the amount paid over to the Secretary of Agriculture, it would seem that it is not without its adequate remedy.

The cause is remanded to the court below there to be treated consistently with this opinion. No costs are allowed to either party.

No. 27—

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, BODINE, PERSKIE, PORTER, COLIE, WELLS, HAGUE, DILL, JJ. 10.

*For reversal*—CASE, DONGES, HEHER, RAFFERTY, THOMPSON, JJ. 5.

No. 28—

*For affirmance and modification*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, WELLS, RAFFERTY, HAGUE, THOMPSON, DILL, JJ. 15.