424 S.E.2d 606

Deborah **BIRTHISEL**, Plaintiff Below, Appellant,

v.

**TRI–CITIES HEALTH SERVICES CORP.**, a West Virginia Corporation, DBA HCA River Park Hospital, Defendant Below, Appellee.

No. 21113.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1992.

Decided Nov. 25, 1992.

Paul A. Ryker, Nancy Matthews, Huntington, for appellant.

Michael J. Farrell, Charlotte A. Hoffman, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, for appellee.

MILLER, Justice:

Deborah Birthisel, the plaintiff below, appeals from an order of the Circuit Court

of Cabell County which granted a motion for summary judgment to Tri–Cities Health Services Corporation, a West Virginia corporation, doing business as HCA River Park Hospital (River Park), the defendant below. The plaintiff filed this civil action for retaliatory discharge after she was fired for refusing to make additions to closed patient charts. The plaintiff now seeks to have us overturn the circuit court's order granting the motion for summary judgment. We decline to do so.

### I.

Ms. Birthisel was hired by River Park in February, 1989, as Assistant Director of Social Services under the supervision of Charles Weinberg, Director of Social Services. The intention of both River Park and Ms. Birthisel, at the time she was hired, was that she would eventually assume Mr. Weinberg's position, as he planned to move into private practice. By the following summer, however, she had been demoted to the position of line staff social worker, apparently because she was not performing her administrative duties adequately. In that position, she continued to be supervised by Mr. Weinberg and by Johanna Lampert.

On Monday, September 25, 1989, Ms. Birthisel and the other social workers received a memorandum from Mr. Weinberg in anticipation of an upcoming accreditation visit from a group from the National Association of Private Psychiatric Hospitals. The memorandum outlined the steps to be taken to review patient files as part of the hospital's Quality Assurance Plan.[1] Primarily, the review involved what was known as the patient's Master Treatment Plan.

It appears from the record that the Master Treatment Plan embodies an historical summary of work done with regard to the patient at the hospital. This includes the patient's social history, treatment plan, discharge planning, and the psychological assessment. The precise delineation of who prepares this data and its form is not spelled out in the record.

The Quality Assurance Plan utilizes a form to guide the review of a patient's treatment.[2] The scope of review generally includes a check of the psychosocial assessment, Master Treatment Plan, and discharge planning. The social worker fills

---

1. The memorandum read as follows:

"Debbie/Ron/Julia
10:00 A.M.
9–25

"As you know NAPPH will be here this Thur/Fri—so we *must* be caught up and *on target* with our work.

"I will be reviewing *every* active chart in the hospital, paying particular attention to [*Master Treatment Plans*] (being individualized) and documentation of *discharge planning notes.*

"Please recheck your charts and make any additions/deletions changes necessary. The purpose of this is *not* a witch hunt, but for us *all* to be *ready for the survey!*

"In addition, for [Quality Assurance], each of you will need to do 10 charts *before* Thur.

"Ron—any 10 from 4W

"Debbie—any 10 from 2W

"Julia—I will get with you—if you have time—5 charts from 3W

"I will cover 3W and 5th floor.

"For *this month's* [Quality Assurance], do not just *note* probs, but where you can—*actually make the changes on the chart.*

"This does *not* mean changing dates, etc. It means if the [Master Treatment Plan] does not have individual strategies, then *add them.* If a signature is needed on the plan, go get it!!

"If there are no [discharge] planning notes, review the chart and add a *final* soc-services [discharge] note.

"Any questions, see me. Realize that these are things we should ALREADY HAVE BEEN DOING.

Thank you,
Chuck

"P.S. Make sure your active charts have *weekly* [discharge] planning notes and *individual* [Master Treatment Plans].

THANX!!"

(Emphasis in original).

2. The general goal of the Quality Assurance Plan is set out as follows:

"The Social Work Department of HCA River Park Hospital has an ongoing Quality Assurance Program designed to objectively and systematically monitor and evaluate appropriateness of services; this includes efforts to identify, assess and resolve problems which will result in improved patient services. The major aspects of care to be monitored include psychosocial assessments, treatment team planning and discharge planning."

out a form based on a review of each of these areas of the patient's file.[3]

After receiving the September 25, 1989 memorandum, Ms. Birthisel felt compliance with the requests contained in the memorandum to be unethical and asked Mr. Weinberg for clarification. Following his explanation, she still found the request objectionable and refused to comply. Specifi-cally, she felt that she was being asked to "doctor" the patient charts. She claimed she could not ethically make any changes to the charts she had been asked to review because they were closed charts of patients with whom she had had no contact. She feared that to do so would be to falsify the records and would constitute a violation of the West Virginia Social Work Code of Ethics, 25 W.Va.C.S.R.App. A (1988), which

3. The following is the relevant information on the Quality Assurance form for the discharge planning area:

"SOCIAL WORK QA MONITORING ACTIVITY

IMPORTANT ASPECT OF CARE/SERVICE: Discharge Planning

INDICATOR: Discharge planning will be a major component and treatment. The initial discharge plan will be identified in the psychosocial assessment ... and will be reviewed weekly for identification of additional discharge needs, or changes in the initial discharge plan. Written progress notes are recorded and discharge planning is evident on the Master Treatment Plan 95% of the time.

THRESHOLD: 79%
DATE: _____ UNIT: _____ M.R.#: _____
REVIEWER: _____ SOCIAL WORKER: _____

| CRITERIA | CRITERIA MET | | | COMMENTS |
|---|---|---|---|---|
|  | YES | NO | N/A |  |
| 1. Was an initial discharge plan included in the psychosocial assessment? | | | | |
| 2. Did discharge planning progress notes include: | | | | |
| a. Documentation of patient and family involvement | | | | |
| b. Description of discharge plan and current status | | | | |
| c. Identification of obstacles and resolutions | | | | |
| d. Writing in a legibly coherent manner | | | | |
| e. Written on a weekly basis | | | | |
| f. Referrals to community services/agencies | | | | |

Level of Compliance: 85%

SAMPLE: All charts will be reviewed upon discharge for completeness of discharge planning.

DATA SOURCES: Social History, Progress Notes, Treatment Plans and reviews.

METHODOLOGY: The Director of Social Work Services will collect raw data from the social work staff each month. Social workers may be assigned charts for review by the Director but may not review their own charts. The Director will collate and evaluate the aggregate data to identify trends and patterns and will report findings, conclusions, actions taken (if indicated) and future recommendations to the Quality Assurance Committee on a monthly basis."

would put her professional social work license in jeopardy.[4]

Mr. Weinberg testified, in his deposition, that the social workers were merely being asked to make sure that the records accurately reflected the course of treatment that the patient had received. Specifically, they were to check that the Master Treatment Plan, which was essentially a summary of treatment, contained the information which was already recorded in the daily progress notes. Mr. Weinberg further testified that following his initial discussion with Ms. Birthisel on the matter, he discussed the memorandum with the head of medical records, who found no problem with it.

At a staff meeting two days later, Ms. Birthisel informed Mr. Weinberg that she had reviewed the charts, as requested, but had not made any changes. She reiterated her position on the ethical questions she had and asked that it be discussed during the meeting. Mr. Weinberg declined to discuss the matter further at the meeting.[5]

Following the meeting, Ms. Birthisel and Mr. Weinberg further discussed the memorandum. When they were unable to reach an agreement regarding the ethics of the request, Mr. Weinberg told Ms. Birthisel that she should discuss the matter with James Sholes, the hospital's administrator. Mr. Weinberg instructed Ms. Birthisel not to leave until she had spoken with Mr. Sholes. Unable to reach Mr. Sholes, Ms.

Birthisel left the hospital at approximately 6:30 p.m.

The next morning, Mr. Weinberg summoned Ms. Birthisel to his office. He informed her that her job performance was unsatisfactory and offered her a choice of resigning or being fired. She chose to resign and tendered her resignation that day.[6] She vacated her office later that day.

## II.

■ Ms. Birthisel acknowledges that she was an "at-will" employee of River Park, but argues that she is nonetheless protected against this type of discharge under our policy enunciated in the Syllabus of *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978):

"The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy [principle], then the employer may be liable to the employee for damages occasioned by this discharge."

■ The question of what constitutes a "substantial public policy principle" as applied to our retaliatory discharge law is not subject to a precise answer. It has not been set out in any Syllabus Point in our retaliatory discharge cases. In *Cordle v. General Hugh Mercer Corp.*, 174 W.Va.

**4.** The plaintiff refers to these provisions of the Code of Ethics:

"THE SOCIAL WORKER'S CONDUCT AND COMPORTMENT AS A SOCIAL WORKER: PROPRIETY—The social worker should maintain high standards of personal conduct in the capacity or identity as social worker. COMPETENCE AND PROFESSIONAL DEVELOPMENT—The social worker should strive to become and remain proficient in professional practice and the performance of professional functions. INTEGRITY—The social worker should act in accordance with the highest standards of professional integrity. THE SOCIAL WORKER'S ETHICAL RESPONSIBILITY TO CLIENTS:

PRIMACY OF CLIENTS' INTERESTS—The social worker's primary responsibility is to the clients."
The plaintiff also sought to rely on the National Association of Social Workers' Code of Ethics. However, this Code has not been adopted by the West Virginia Board of Social Work Examiners.

**5.** Apparently, none of the other social workers were troubled by the request and had complied with it.

**6.** We have recognized that a constructive discharge can result where an employee has been forced to resign by improper actions of an employer. *See Slack v. Kanawha County Housing & Redev. Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992).

321, 325, 325 S.E.2d 111, 114 (1984), which involved a retaliatory discharge claim, we quoted from *Allen v. Commercial Casualty & Insurance Co.*, 131 N.J.L. 475, 478, 37 A.2d 37, 39 (1944), where the court gave these sources of "public policy":

> "'The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people for whom government—with us—is factually established.'"

Most of our retaliatory discharge cases involve violations of statutes that we deem to articulate a substantial public policy. *See, e.g., Collins v. Elkay Mining Co.*, 179 W.Va. 549, 371 S.E.2d 46 (1988) (West Virginia Mine Safety Act, W.Va.Code, 22A-1A-20); *McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987) (Wage and Hour Act, W.Va.Code, 21-5C-8); *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980) (Workers' Compensation Act, W.Va. Code, 23-5A-1); *Harless v. First Nat'l Bank in Fairmont, supra* (West Virginia Consumer Credit and Protection Act, W.Va.Code, 46A-1-101, *et seq.*).

Other states have attempted to specify what may constitute sources of public policy in a retaliatory discharge context. For example, one of the more commonly accepted definitions is found in Syllabus Point 3 of *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982):

> "In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject."

*See also Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla.1989); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984).

In *Townsend v. L.W.M. Management, Inc.*, 64 Md.App. 55, 59, 494 A.2d 239, 242, *cert. denied*, 304 Md. 300, 498 A.2d 1186 (1985), the Maryland Court of Special Appeals paraphrased the definition given in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), as follows:

> "It is society's interest upon which primary focus is required. The source of the 'clear mandate of public policy' may be found in legislative enactments, prior judicial decisions and administrative regulations, or it may be undeclared, in which case, extreme care must be taken to insure that it is, in fact, the policy of the State. In any case, the public policy found must be 'sufficiently clear to provide the basis for a tort or contract action for wrongful discharge.'" (Citations omitted).

A more comprehensive definition was offered by the New Jersey Supreme Court in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505, 512 (1980):

> "We hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. For example, a code of ethics designed to serve only the interests of a profession or an administrative regulation concerned with technical matters probably would not be sufficient."

Finally, both California and Wisconsin appear to have adopted more restrictive definitions. Thus, in *Gantt v. Sentry Insurance Co.*, 1 Cal.4th 1083, 1094–96, 4 Cal.Rptr.2d 874, 881–82, 824 P.2d 680, 687–88 (1992), the California Supreme Court stated that courts "may not declare public policy without a basis in either the constitution or statutory provisions." The Wisconsin Supreme Court in *Brockmeyer v. Dun*

& *Bradstreet*, 113 Wis.2d 561, 573, 335 N.W.2d 834, 840 (1983), concluded that "[t]he public policy must be evidenced by a constitutional or statutory provision."

In addition to considering the sources of public policy that may protect an employee from a retaliatory discharge, we note that in *Harless* we used the phrase "substantial public policy." This was designed to exclude claims that are based on insubstantial considerations. The term "substantial public policy" implies that the policy principle will be clearly recognized simply because it is substantial. An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations. The California Supreme Court in *Gantt* made this observation, with which we agree: "The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes[.]" 1 Cal.4th at 1095, 4 Cal.Rptr.2d at 882, 824 P.2d at 688.

■ To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations,[7] and judicial opinions. Inherent in the term "substantial public policy" is the concept that the policy will provide specific guidance to a reasonable person.[8]

■ We also have held, as have other jurisdictions,[9] that in a retaliatory discharge case, the employer may defend the discharge by showing a legitimate, nonpretextual, and nonretaliatory reason for its action. As we explained in Syllabus Point 2 of *Powell v. Wyoming Cablevision, Inc.*, 184 W.Va. 700, 403 S.E.2d 717 (1991):

"When an employee makes a prima facie case of discrimination, the burden then shifts to the employer to prove a legitimate, nonpretextual, and nonretaliatory reason for the discharge. In rebuttal, the employee can then offer evidence that the employer's proffered reason for the discharge is merely a pretext for the discriminatory act."

### III.

■ In this case, the plaintiff contends that the task assigned required her to alter patient records. However, the Quality Assurance plan contained prescribed procedures for review of the Master Treatment Plans. The plaintiff was asked to review the Master Treatment Plans and to identify any missing information. She was then to retrieve such information from the patient files and to insert it in the Master Treatment Plans. There was no requirement that material not in the patient files be obtained or that material already in the files be altered in any manner.

The plaintiff relies on regulations established by the West Virginia Social Work Board and approved by the legislature.[10] She also relies on the general policy language contained in the social workers licensing statute.[11] Neither of these provi-

---

7. W.Va.Code, 29A–1–1, *et seq.*, contains procedures for legislative approval of administrative regulations.

8. This is analogous to our rule with regard to liability of public officials for their official acts. We have held that liability attaches where the public official violates clearly established law which would be known to a reasonable official. *See State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992).

9. *See, e.g., Phipps v. Clark Oil & Ref. Corp.*, 408 N.W.2d 569 (Minn.1987); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984).

10. *See* note 4, *supra*, for text.

11. Plaintiff points to this language in W.Va. Code, 30–30–1:

"The Legislature finds that the profession of social work profoundly affects the lives of the people of this state.
"The profession of social work exists to provide humane and effective social services to individuals, families, groups, communities and society in order that social functioning may be enhanced and the quality of life improved.

sions contain any specific guidance. Their general admonitions as to the requirement of good care for patients by social workers do not constitute the type of substantial and clear public policy on which a retaliatory discharge claim can be based. If such a general standard could constitute a substantial public policy, it would enable a social worker to make a challenge to any type of procedure that the worker felt violated his or her sense of good service.

A similar problem led the New Jersey Supreme Court in *Pierce v. Ortho Pharmaceutical Corp., supra,* to reject, by way of a summary judgment, the plaintiff's retaliatory discharge claim. In *Pierce,* a physician employed by a pharmaceutical company doing medical research on drugs was opposed to utilization of saccharin in a drug formulation because she believed that saccharin might be harmful. When the physician refused to work on the project, the company fired her. The court concluded it could not find a clear violation of any ethical rules governing physicians and made this comment:

"[A]n employee should not have the right to prevent his or her employer from pursuing its business because the employee perceives that a particular business decision violates the employee's personal morals, as distinguished from the recognized code of ethics of the employee's profession." 84 N.J. at 72, 417 A.2d at 512. (Citation omitted).

The present case also bears some analogy to *Lampe v. Presbyterian Medical Center,* 41 Colo.App. 465, 590 P.2d 513 (1978), where the plaintiff was the chief nurse of the hospital's intensive care unit. She was asked by the hospital administrator to decrease the number of hours of overtime worked by the nurses in the unit. She believed that such a reduction would impair the patients' health care and refused to do so. As a result, she was fired.

In her retaliatory discharge suit, the nurse asserted that her actions were based on standards of good nursing care contained in the legislative declaration of policy in the nurses' licensing statute. This provision " 'declare[d] ... it to be the policy of this state that, in order to safeguard life, health, property, and the public welfare ..., it is necessary that a proper regulatory authority be established [for nurses.]' " 41 Colo.App. at 467, 590 P.2d at 515, *quoting* Colo.Rev.Stat. § 12–38–201. A second basis articulated was a regulation which authorized the discipline of a nurse who " 'has negligently or willfully acted in a manner inconsistent with the health or safety of persons under her care.' " 41 Colo.App. at 467, 590 P.2d at 515, *quoting* Colo.Rev.Stat. § 12–38–217. The court, in rejecting the plaintiff's claim that her discharge violated public policy, stated:

"[T]he plaintiff in this case relies on a broad, general statement of policy contained in a statute which creates the State Board of Nursing and which gives that Board the authority to discipline a nurse who negligently or willfully acts in a manner inconsistent with the health or safety of persons under her care. Given the general language used in the statute relied on in this case, we cannot impute to the General Assembly an intent to modify the contractual relationships between hospitals and their employees in such situations. Neither can we impute an intent to create a claim for relief based on a mere possibility of disciplinary action under § 12–38–217, C.R.S. 1973." 41 Colo.App. at 468, 590 P.2d at 515–16.

Another analogous case is *Crockett v. Mid–America Health Services,* 780 S.W.2d 656 (Mo.App.1989), where the plaintiff was discharged as director of nursing. She claimed that her discharge was the result

"Social workers are involved with individuals who are hurt, vulnerable and having difficulty in areas of their lives which are extremely sensitive. Failure to help these individuals, whether through incompetence or irresponsibility, is a serious matter. These individual citizens have the potential to be greatly harmed by the services of ill-prepared and incapable persons acting as social workers. The economic burden of social services which

do not give effective aid is a serious social problem.

"It is the purpose of this article to protect the public by setting standards of qualification, education, training and experience for those who seek to engage in the practice of social work and to promote high standards of professional performance for those engaged in the profession of social work."

of an adverse report she gave to the Joint Commission on Accreditation of Hospitals. The court, without any extensive discussion, affirmed a summary judgment against the plaintiff, finding that there had been no "violation of a statute, constitutional provision or regulation adopted pursuant to a statute[.]" 780 S.W.2d at 658.

As we have earlier pointed out, the regulations and statutory language regarding social workers contain no specific provision relating to a patient's record review. As in *Lampe*, both the statute and the regulations relied upon by the plaintiff are extremely general and do not constitute a specific statement of public policy. Moreover, when we look to the disciplinary grounds contained in the social workers' licensing statute, W.Va.Code, 30–30–7, we do not find any direct prohibition against the conduct requested of the plaintiff in this case.[12]

This is not a case where the plaintiff was asked to testify falsely in a medical malpractice claim, as occurred in *Sides v. Duke University*, 74 N.C.App. 331, 328 S.E.2d 818, *review denied*, 314 N.C. 331, 333 S.E.2d 490 and 314 N.C. 331, 335 S.E.2d 13 (1985). There, the public policy violation was the coercion of false testimony by a threat of loss of job which was consummated when the plaintiff refused to testify falsely. Nor is it like *Trombetta v. Detroit, Toledo & Ironton Railroad Co.*, 81 Mich.App. 489, 265 N.W.2d 385 (1978), where the employee was discharged for refusing to alter test results on pollution control reports, where such alteration constituted a crime.

Here the plaintiff was not asked to falsify the patient files, but was asked to check each file to determine if information was missing from the Master Treatment plan. If missing information could be obtained from the patient file, then it was to be added to the Master Treatment plan. This activity violated no statute or regulation.

## IV.

For the reasons stated, we conclude that the circuit court was correct in granting summary judgment. Accordingly, the judgment of the Circuit Court of Cabell County is affirmed.

Affirmed.

---

**12.** W.Va.Code, 30–30–7, provides nine grounds for disciplinary proceedings. Most are inapplicable to this case because they deal with making false statements to the Board on applications, conviction of a felony, mental or physical impairment, or practicing without a license. The two that could relate generally are set out in subsections (3) and (6) of the statute and apply when a social worker:

"(3) Has been grossly negligent or exhibited unprofessional or unethical conduct in the practice of social work;

\*   \*   \*   \*   \*   \*

"(6) Has been found guilty by the board of unprofessional conduct in accordance with the rules and regulations promulgated by the board[.]"