IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0671

_____

FILED

**April 10, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WILLIAM FROHNAPFEL AND MARY LOU FROHNAPFEL,
Plaintiffs Below, Petitioners

v.

ARCELORMITTAL USA LLC AND ARCELORMITTAL WEIRTON LLC,
Defendants Below, Respondents

_____

Certified Question from the United States District Court
for the Northern District of West Virginia

CERTIFIED QUESTION ANSWERED

_____

Submitted: February 25, 2015
Filed: April 10, 2015

Robert J. D'Anniballe, Jr., Esq.
Pietragallo Gordon Alfano
Bosick & Raspanti, LLP
Weirton, West Virginia
Counsel for Petitioners

Bradley K. Shafer, Esq.
Swartz Campbell, LLC
Wheeling, West Virginia

Raymond C. Baldwin, *Pro Hac Vice*
Seyfarth Shaw LLP
Washington, DC
Counsel for Respondents

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.    "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court."  Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998).

2.  "The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge."  Syllabus, *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

3.  "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."  Syl. Pt. 2, *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992).

4. "Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." Syl. Pt. 3, *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992).

5. An employee who alleges he or she was discharged for reporting violations of a permit issued under authority of the West Virginia Water Pollution Control Act, W.Va. Code §§ 22-11-1 to -30 (2014), and making complaints to his/her employer about those permit violations, has established the predicate substantial public policy required to *prima facie* prove that the employer's motivation for the discharge was the contravention of public policy. *See Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

LOUGHRY, Justice:

This case is before us on certified question from the United States District Court for the Northern District of West Virginia and presents the singular question of whether the West Virginia Water Pollution Control Act (the "Act")[1] establishes a substantial public policy for purposes of undergirding a policy-based retaliatory discharge claim[2] where an employee is allegedly discharged for reporting violations of a permit issued under that Act and making complaints to his employer about those permit violations. Having considered this issue in conjunction with a review of both statutory and case law, we answer the certified question in the affirmative.

## I.  Factual and Procedural Background

Prior to his termination,[3] William Frohnapfel was employed by the respondent ArcelorMittal Weirton ("AM Weirton"), a tin plate manufacturer.[4] The petitioner worked

---

[1]*See* W.Va. Code §§ 22-11-1 to -30 (2014).

[2]*See* Syllabus, *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

[3]Mr. Frohnapfel was employed by the respondents and their predecessors from April 4, 1972, until his termination on April 18, 2013.

[4]At the time of his termination, Mr. Frohnapfel's employment was governed by a collective bargaining agreement between his union, the United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, and the respondent parent company of AM Weirton–ArcelorMittal USA. The petitioner filed a grievance in connection with his termination; the termination was upheld.

as a Technician II Operator in AM Weirton's Environmental Control/Utilities Department. This department was charged with oversight of B-Outfall–a portion of the AM Weirton plant that discharges hazardous byproducts from its manufacturing process directly into the Ohio River.

The B-Outfall is located near water intake lines that provide drinking water to local residents of Weirton, West Virginia, and Steubenville, Ohio. The discharge from the B-Outfall is governed by a permit and order issued under the Act's authority.[5] Pursuant to the Act, AM Weirton is required to monitor and make reports regarding this discharge to the West Virginia Department of Environmental Protection ("DEP"). As part of his job, Mr. Frohnapfel was charged with helping to ensure that AM Weirton operated in compliance with both this permit and other applicable environmental laws, rules, and regulations.

According to the allegations of the petitioners' complaint, the respondents "viewed him as a watch dog for environmental compliance and a potentially dangerous whistleblower in regard to environmental violations."[6] Included in the complaint is a litany

---

[5]According to the petitioners' complaint, the Permit number is WV003336 and the Order number is 6436. Those governing documents, issued under authority of the Act, are part of a National Pollutant Discharge Elimination System created by Section 402 of the Federal Water Pollution Control Act (known as the Clean Water Act).

[6]Mr. Frohnapfel avers that the potentially hazardous chemicals being released into the Ohio River from the B-Outfall include chrome, arsenic, cyanide, oil, and tin.

-2-

of six incidents separate from the events that immediately preceded his termination in April 2013. The district court capsulated these allegations as follows:

- In February 2009, plaintiff complained to management after being instructed to "scrape labels off barrels and replace them with new labels due to expiration issues";
- In March 2009, plaintiff informed management that a probe was being placed in a buffer in order to conceal certain PH issues;
- In June 2010, plaintiff truthfully responded to an inquiry from the WVDEP concerning the dumping of hazardous waste and was thereafter "summoned to the Office of the Defendants' highest ranking management official located in Weirton";
- In November 2010, plaintiff complained regarding the inadequacy of hazardous material incident training, and was thereafter "chastised," "disciplined," and disqualified from receiving a promotion;
- In January 2011, plaintiff expressed concern regarding the lack of a containment area for "Prussian Blue," a hazardous waste; and
- In June 2012, plaintiff questioned a third-party vendor's practices associated with the removal of hazardous waste and was thereafter harshly disciplined and temporarily suspended from work.

The events that transpired just before Mr. Frohnapfel's termination in April 2013 had their genesis in a broken piece of machinery used at B-Outfall. As the district court related, a group of AM Weirton employees asked Mr. Frohnapfel to present their plan for solving the hazardous waste accumulation resulting at B-Outfall to management. When the petitioner advised management of the employees' proposed solution, he was told that a plan to repair the disabled equipment was already in place. While informing his coworkers regarding this meeting, Mr. Frohnapfel "remarked, apparently in reference to management,

that 'opinions are like assholes, everybody has one, some people have two.'" Due to an open microphone, the petitioner's comments were broadcast throughout the Environmental Control/Utilities Department. As a result of the broadcast incident, the petitioner was immediately suspended and then terminated several days later.

In addition to filing a grievance to protest his termination,[7] the petitioners instituted a cause of action against the respondents in the Circuit Court of Hancock County seeking damages for retaliatory discharge and loss of consortium. The respondents removed the case to federal court on grounds of diversity.[8] By order entered on July 11, 2014, the district court certified the following question to this Court:

> Whether the West Virginia Water Pollution Control Act, W.Va. Code §§ 22-11-1 *et seq.*, establishes a substantial public policy of West Virginia such that it may undergird a *Harless* claim for retaliatory discharge where an employee is allegedly discharged for reporting violations of a permit issued under the Act and complaining to his employer about such violations?

Expressing its opinion on the issue, the district court recognized the existence of "a strong argument that the WPCA [Act] articulates a public policy sufficient to support a *Harless* retaliatory discharge claim."

---

[7]*See supra* note 4.

[8]*See* 28 U.S.C. § 1332 (2012).

-4-

## II. Standard of Review

As we stated in syllabus point one of *Light v. Allstate Insurance Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998), "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Accordingly, we proceed to consider the certified question presented by the district court.

## III. Discussion

Seeking to temper the otherwise harsh results that would obtain where a discharge from employment was impelled by the employer's desire to contravene public policy, an exception to the common law doctrine of at-will employment was established.[9] *See Wright v. Standard Ultramarine and Color Co.*, 141 W.Va. 368, 382, 90 S.E.2d 459,

---

[9]We do not opine on whether Mr. Frohnapfel qualified as an at-will employee in view of the collective bargaining agreement that controlled the terms of his employment. While remarking "[t]here appears to be no dispute as to whether plaintiff is an at will employee," the district court identified contrary authority. *See Lamb v. Briggs Mfg.*, 700 F.2d 1092, 1093-94 (7th Cir. 1983) (applying Illinois law to decide that where employment is governed by collective bargaining agreement that provides "proper cause" termination guarantee and arbitral remedies, employee is not at-will employee and is prohibited from maintaining retaliatory-discharge claim); *but see Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1447 n.3 (1994) (commenting that "Illinois law now appears to permit employees covered under a collective bargaining agreement to bring state law retaliatory discharge claims against employers under certain circumstances" but ruling that under Missouri law, union employees cannot bring policy-based wrongful discharge claims); *see also Norris v. Hawaiian Airlines, Inc.*, 842 P.2d 634 (1992) (holding that Hawaii Whistleblower's Protection Act protects both unionized contract employees and at-will employees from being discharged in violation of public policy).

468 (1955) (recognizing that at-will employees serve at will and pleasure of their employers and may be discharged at any time, with or without cause).  That exception, created in *Harless v. First National Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978), provides:

> The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.

*Id.* at 116, 246 S.E.2d at 271, syllabus.

As the district court correctly recognized, "a *Harless* retaliatory discharge claim cannot lie absent a substantial West Virginia public policy allegedly violated in terminating the employee."  *See Shell v. Metropolitan Life Ins. Co.*, 183 W.Va. 407, 413, 396 S.E.2d 174, 180 (1990) (recognizing that "[o]ur retaliatory discharge cases are generally based on a public policy articulated by the legislature").  And, while the "question of what constitutes a 'substantial public policy principle' . . . is not subject to a precise answer," we addressed both the sources of public policy and what is necessary to constitute substantial public policy in *Birthisel v. Tri-Cities Health Services Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992).  *Id.* at 375, 424 S.E.2d at 610.

In attempting to identify the areas from which public policy may be gleaned in *Birthisel*, we relied upon the following oft-cited explanation:

-6-

> "'The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people for whom government–with us–is factually established.'"

*Id.* at 376, 424 S.E.2d at 611 (quoting *Allen v. Commercial Cas. & Ins. Co.*, 37 A.2d 37, 39 (N.J. 1944) (internal citations omitted)). Further guidance regarding the elusive nature of public policy was drawn from this observation in *Parnar v. Americana Hotels, Inc.*, 652 P.2d 625 (1982): "In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." *Id.*, syl. pt. 3, in part. Borrowing from these authorities, we distilled the following standard in syllabus point two of *Birthisel:* "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Syl. Pt. 2, *Birthisel,* 188 W.Va. at 372, 424 S.E.2d at 607.

After identifying the sources of public policy in *Birthisel*, we considered what is required to constitute "substantial public policy." As an initial matter, we clarified that our use of "substantial" to modify "public policy" in *Harless* was expressly "designed to exclude claims based on insubstantial considerations." *Birthisel*, 188 W.Va. at 377, 424

S.E.2d at 612.  Expounding further, we stated:

> The term "substantial public policy" implies that the policy principle will be clearly recognized simply because it is substantial.  An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations.

*Id.*  Commenting additionally on this matter in *Feliciano v.7-Eleven, Inc.*, 210 W.Va. 740, 559 S.E.2d 713 (2001), we observed that "to be substantial, a public policy must not just be recognizable as such but be so widely regarded as to be evident to employers and employees alike."  *Id.* at 745, 559 S.E.2d at 718.  Mindful of this concern, we recognized in syllabus point three of *Birthisel* that "[i]nherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person."  188 W.Va. at 372, 424 S.E.2d at 607.

Addressing whether the nursing regulations and general language contained in the social workers licensing statute that the plaintiff relied upon in *Birthisel* met the threshold definition of substantial public policy, we opined:

> *Neither of these provisions contain any specific guidance. Their general admonitions as to the requirement of good care for patients by social workers do not constitute the type of substantial and clear public policy on which a retaliatory discharge claim can be based.*  If such a general standard could constitute a substantial public policy, it would enable a social worker to make a challenge to any type of procedure that the worker felt violated his or her sense of good service.

188 W.Va. at 377-78, 424 S.E.2d at 612-13 (emphasis supplied). Of import to this Court

was the fact that neither the regulations nor the applicable licencing statutes contained any

specific provisions that addressed the allegedly improper conduct requested of the plaintiff

by her employer.[10] Not only did the plaintiff fail to establish substantial public policy in

*Birthisel*, but she also failed to show that the actions requested of her by her employer were

contrary to statutory or regulatory law. As we recounted:

> Here the plaintiff was not asked to falsify the patient files, but was asked to check each file to determine if information was missing from the Master Treatment plan. If missing information could be obtained from the patient file, then it was  to be added to the Master Treatment plan. *This activity violated no statute or regulation.*

*Id.* at 379, 424 S.E.2d at 614 (emphasis supplied).



As we observed in *Birthisel,* "[m]ost of our retaliatory discharge cases involve

violations of statutes that we deem to articulate a substantial public policy." 188 W.Va. at

376, 424 S.E.2d at 611 (citing cases involving violations of the W.Va. Mine Safety Act, the

Wage and Hour Act, the Workers' Compensation Act, and the Consumer Credit and

Protection Act). As this Court made clear in *Swears v. R.M. Roach & Sons, Inc.*, 225 W.Va.

---

[10]The plaintiff viewed her employer's request to undertake chart reviewing efforts in preparation for an upcoming accreditation visit as unethical in that it required a falsification of records. The employer explained its request as seeking to comport the Master Treatment plan–essentially a summary of treatment–with information already recorded in the daily progress notes. *See Birthisel*, 188 W.Va. at 375, 424 S.E.2d at 610.

699, 696 S.E.2d 1 (2010), a *Harless*-based action requires more than simply raising the spectrum of a potentially governing law. "The mere citation of a statutory provision is not sufficient to state a cause of action for retaliatory discharge without a showing that the discharge violated the public policy that the cited provision clearly mandates." *Id.* at 705, 696 S.E.2d at 7. In *Swears,* the former employee sought to rely on this state's criminal laws as the source of public policy that was violated by his termination. Rejecting the former employee's attempt to elevate his internally-raised concern for possible criminal conduct to the level of public policy, this Court explained that the allegations constituted an alleged violation of the financial interests of a private corporation. Critically, however, they did not involve a claimed violation of public policy or anything that might be injurious to the public good. *Id.*

Turning to the case before us, the petitioners assert that the respondents wrongfully terminated Mr. Frohnapfel for reporting violations of its permit issued under authority of the Act and then raising concerns with AM Weirton about those permit violations.[11] In marked contrast to *Swears,* which involved fiduciary duties owed to a private company, the crux of the petitioners' claims is rooted in allegations of both public policy violations and potential harm to a water source for some of this state's citizenry. *See*

---

[11]The record does not indicate whether Mr. Frohnapfel reported the alleged permit violations to an external environmental regulator. Because of the manner in which this case presents, we have limited information about the factual predicates underlying the complaint.

-10-

225 W.Va. at 702, 696 S.E.2d at 4.  For proof of the requisite public policy, the petitioners

cite to the following declaration included in the Act:

> (a) It is declared to be the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development.
>
> (b) It is also the public policy of the State of West Virginia that the water resources of this State with respect to the quantity thereof be available for reasonable use by all of the citizens of this State.

W.Va. Code § 22-11-2.


While the petitioners cited only to the Act's express declaration of policy, the

district court took judicial notice of three additional provisions of the Act as the source of

public policy applicable to this case.  The first of those provisions makes it unlawful to

increase the volume or concentration of sewage or industrial wastes in excess of the

discharges or disposition specified by permit.  *See* W.Va. Code § 22-11-8(b)(4).  The second

makes the violation of a permit issued under the Act subject to a civil penalty not to exceed

$25,000 per day.  *See* W.Va. Code § 22-11-22(a).  The final provision identified by the

district court establishes a misdemeanor offense for the failure or refusal to comply with the

terms or conditions of a permit issued under the Act.  *See* W.Va. Code § 22-11-24(a).

-11-

Viewing all of these legislative provisions together, the district court reasoned that the Act "sets forth a specific public policy: maintaining 'reasonable standards of purity and quality' of West Virginia water." *See* W.Va. Code § 22-11-2. Flowing from this overarching policy objective, the district court viewed the Act as sufficiently clear in stating its public policy-based concerns:

> the Act regulates manufacturers' ability to discharge hazardous material into West Virginia waterways by issuing permits, and noncompliance with a permit subjects a violator to heavy civil fines and potential criminal penalties. Moreover, while the statement of public policy is itself broad, the requirements imposed upon employers who hold permits issued pursuant to the WPCA [Act] provide specific guidance as to permitted and prohibited conduct. Finally, the purpose of the Act could be frustrated if employees who reported violations of the Act to environmental authorities and were terminated for doing so were left without a remedy. (internal citations omitted)

Rejecting the district court's reasoning, the respondents contend that the Act's statement of public policy contains only broad pronouncements that are "too general to provide any specific guidance" and "so vague that it is subject to different interpretations." *Birthisel*, 188 W.Va. at 377, 424 S.E.2d at 612. Characterizing the Act as nebulous in terms of expressing public policy, the respondents insist the subject legislation lacks sufficient substance for purposes of establishing the predicate public policy the petitioners need to pursue their retaliatory discharge action. In the same manner the standard of "good care" was deemed too broad to serve as the source of public policy in *Birthisel*, the respondents

-12-

maintain that the Act's objective of maintaining reasonable standards of water purity and quality is equally vague and imprecise. Because the necessary degree of guidance regarding the particulars of prohibited conduct is lacking, the respondents assert they necessarily lacked knowledge regarding the specific acts that violate the public policy created by the Act.

We find these arguments to be without merit. If employers were truly without advance notice of what actions constitute violations of the Act and/or permits issued in conjunction with the Act, that would undeniably create grounds for challenging enforcement of its provisions. But the case before us does not involve an employer being forced to operate oblivious to the compliance requirements of its permit.[12] As the district court recognized, permits issued under the Act's authority contain the necessary specificity regarding the permissible levels of various chemical waste effluents. Moreover, it stands to reason that a regulatory area which involves compliance with federal clean water standards[13] is necessarily so complex that the exactitudes of the governing regulations will not typically be delineated in the governing legislation. *See State ex rel. Ball v. Cummings*, 208 W.Va. 393, 397, 540 S.E.2d 917, 921 (1999) (discussing framework of National Pollutant Discharge Elimination System under which permits issue pursuant to this state's

---

[12]The respondents relate that "the permit and order at issue during the time period relevant to the Complaint is 85 pages" in length.

[13]*See supra* note 5.

Water Pollution Control Act and recognizing that those permits require compliance with specified terms and conditions).  Consequently, we have no difficulty in concluding that the Act's referential reliance on federal regulations and guidelines for purposes of identifying permissible levels of discharge does not render the subject legislation too vague for interpretation or compliance purposes.

To be clear, the respondents ground their position in the transmutable nature of the permits rather than contending they were uninformed as to the particulars of the permit requirements.  Because permits issued under the Act are subject to modification, suspension or revocation,[14] the respondents argue that this potential for change necessarily renders them incapable of "provid[ing] clear and consistent standards."  Given that there was no indication that the permit at issue was in fact modified during time periods relevant to this litigation, we find this argument to be specious at best.  The mere possibility that the quantitative levels of a particular effluent may be altered or the list of hazardous chemicals subject to monitoring may be expanded does not *ipso facto* prevent the Act from presenting standards that are sufficiently precise for purposes of demarcating public policy.

In their attempt to persuade us that a *Harless*-based retaliatory discharge claim

---

[14]According to the respondents, permits issued pursuant to the National Pollutant Discharge Elimination System are subject to alteration with a minimum of twenty days notice.

cannot be based on the violation of a permit, the respondents stress that employers will be subjected to vagaries in terms of identifying conduct prohibited under the Act. To illustrate their point, the respondents refer to an employee's complaint regarding an unspecified "lime discharge."[15] This discharge, the respondents submit, may actually be in compliance with all laws, permits, and regulations. Similarly, the respondents note that an employee's report of the accumulation of hazardous material may, depending on the circumstances, actually be an allowable amount of such materials. Neither of these examples fits the parameters of the question posed by the district court. We have not been asked to decide whether an employer can take action against an employee who seeks on his own, separate from government-specified standards, to be an environmental watchdog. The precise question before us focuses *solely* on an employer who discharges an employee for his reporting of violations of a permit issued under authority of the Act and for his complaints to the employer about those same permit violations.

In contrast to the position advocated by the respondents, we find no lack of guidance with regard to what conduct is prohibited by the Act. The Act makes it unlawful for an entity issued a permit under its authority to violate the provisions of that permit. *See* W.Va. Code § 22-11-22(a). Given the inclusion of both civil and criminal penalties for

---

[15]According to the allegations of the complaint, Mr. Frohnapfel raised a concern on April 14, 2013, that AM Weirton committed an improper lime discharge.

violating permits issued pursuant to the Act, there can be little doubt as to the seriousness with which the Legislature views the need to protect this state's water sources. With sufficient clarity, the Legislature pronounced a specific statement of public policy, the objective of which is to maintain reasonable standards of water purity and quality for the public's health and enjoyment. *See* W.Va. Code § 22-11-2. That laudable policy objective was imbued with the necessary teeth of enforcement by the inclusion of both civil and criminal penalties for violations of the Act. Consequently, we are compelled to reject the respondents' argument that the Act cannot serve as a source of substantial public policy based upon its lack of "specific guidance to a reasonable person." *Birthisel*, 188 W.Va. at 372, 424 S.E.2d at 607, syl. pt. 3, in part.

The employers of this state, including AM Weirton, have long been on notice that they cannot terminate an employee for his or her efforts to uphold this state's laws.[16] *See Harless*, 162 W.Va. at 116, 246 S.E.2d at 271, syllabus; *see also Kanagy v. Fiesta Salons, Inc.*, 208 W.Va. 526, 533, 541 S.E.2d 616, 623 (2000) ("There is a substantial public

---

[16]The respondents urge us to find significance in the fact that the Federal Water Pollution Control Act contains an anti-retaliatory provision while our Act does not. *See* 33 U.S.C. § 1367 (2012) (providing that "[n]o person shall fire, or in any other way discriminate against, or cause to be fired or discriminated against, any employee . . . by reason of the fact that such employee . . . has filed, instituted . . or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter"). In this Court's opinion, the non-inclusion of an anti-retaliatory provision does not foreclose a determination that the Act expresses substantial public policy for purposes of undergirding a *Harless*-based retaliatory discharge action.

interest in discouraging illegal behavior."). For more than twenty years, the provisions of the Act have governed the acts of enterprises such as AM Weirton who utilize this state's waterways to discard the chemical residue of their manufacturing processes. Given the clarity of the Act's provisions that make it unlawful to violate a permit issued under the Act, it cannot be doubted that AM Weirton was fully apprised of its permit-related responsibilities under the Act as well as the penalties for non-compliance. Furthermore, it simply cannot be disputed that those compliance requirements are rooted in substantial public policy objectives whose aim is directed at providing for and promoting the public's health and well-being. Accordingly, we hold that an employee who alleges he or she was discharged for reporting violations of a permit issued under authority of the West Virginia Water Pollution Control Act, W.Va. Code §§ 22-11-1 to -30 (2014), and making complaints to his employer about those permit violations, has established the predicate substantial public policy required to *prima facie* prove that the employer's motivation for the discharge was the contravention of public policy. *See Harless*, 162 W.Va. 116, 246 S.E.2d 270 (1978).[17]

---

[17]As we noted in *Feliciano*, "[a]n aggrieved employer may then rebut the presumption of a wrongful discharge by demonstrating that it had a plausible and legitimate business reason for terminating its employee." 210 W.Va. at 751, 559 S.E.2d at 724; *see* Syl. Pt. 2, *Powell v. Wyoming Cablevision, Inc.*, 184 W.Va. 700, 403 S.E.2d 717 (1991).

## IV. Conclusion

For the foregoing reasons, we answer the certified question in the affirmative.

Certified question answered.