Gregory M. COLLARD, Plaintiff,

v.

SMITH NEWSPAPERS, INC., an Alabama corporation, Newspaper Management Company, Inc., an Alabama corporation, and TLS Communications, Inc., an Alabama corporation, Defendants.

Civil Action No. 3:94–0771.

United States District Court,
S.D. West Virginia,
Huntington Division.

Feb. 6, 1996.

Michael W. Carey, Timothy P. Armstead, Charleston, WV, for plaintiff.

Rudolph L. DiTrapano, Suzanne M. Weise, Charleston, WV, for defendants.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Throughout most of this century, the dominant metaphor used to justify freedom of speech and of the press has been the "marketplace of ideas." Originally enunciated by John Milton and John Stuart Mill, the "marketplace" metaphor came to the forefront of First Amendment jurisprudence in Justice Oliver Wendell Holmes's dissenting opinion in *Abrams v. United States*, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919). Writing for himself and Justice Brandeis, Justice Holmes stated: "[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market." *Id.* at 630, 40 S.Ct. at 22.

First Amendment cases usually involve lawsuits by plaintiffs seeking to enjoin government interference in the "marketplace of

ideas." In this case, however, the plaintiff Gregory Collard actually seeks government intervention in that marketplace. Much like persons bringing antitrust actions for commercial marketplace failures, Mr. Collard claims a failure in the "marketplace of ideas" and argues that the Court should step in to correct that failure. In their motion for summary judgment, the defendants argue that the Court cannot and should not interfere in the "marketplace of ideas." For the reasons stated below, the Court agrees with the defendants and **GRANTS** their motion for summary judgment.

## I. Background

This case arises out of the discharge of the plaintiff Gregory Collard from his employment as managing editor for the *Lincoln Journal,* a newspaper owned by Lincoln County Newspapers, Inc. (Lincoln Newspapers). In his Second Amended Complaint, Mr. Collard asserts three causes of action: (1) against all of the defendants for causing his termination in violation of a substantial public policy of .the State of West Virginia; (2) against all of the defendants for breaching their duty of good faith and fair dealing to him; and (3) against Smith Newspapers, Inc. (Smith Newspapers) and Newspaper Management Company, Inc. (Newspaper Management) for tortiously interfering with his advantageous business and employment relationship with the *Lincoln Journal.* The defendants have moved for summary judgment on each of the asserted causes of action. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties and the amount in controversy exceeds $50,000.

### A.

Mr. Collard asserts that he was discharged because of a series of articles and editorials that he wrote for the *Lincoln Journal* about the political controversy surrounding the proposed consolidation of Lincoln County, West Virginia's public schools. The articles and editorials, printed in the summer of 1994, suggested that State Senator Lloyd Jackson; Wylie Stowers, Chairman of the Lincoln County Democratic Party; Greg Stowers,

son of Wylie Stowers and former President of the Lincoln County Commission; Lyle Stowers, son of Wylie Stowers and brother of Greg Stowers; Lincoln County Schools Superintendent Dallas Kelley; and Assistant Superintendent Larry Pritchard had met secretly and decided, without public input, that Lincoln County would have one consolidated high school. Mr. Collard's articles and editorials implied that these individuals had significant control over the Lincoln County Board of Education, West Virginia State Board of Education, and the West Virginia School Building Authority and thus the outcomes of any school consolidation and funding votes. Mr. Collard claims that Ruth Adkins, publisher of the *Lincoln Journal,* as well as each of the defendants, approved the publication of all of the articles and editorials.

In late July or early August of 1994, David Smith, president of the defendant TLS Communications, Inc. (TLS), requested that Mr. Collard submit to him for approval any proposed articles, editorials, or letters to the editor that mentioned Mr. Jackson or the Stowers family. Shortly thereafter, Mr. Collard prepared a draft article about his investigation of the Stowers family's property holdings near the location of a proposed consolidated high school and sent it as directed to Mr. Smith for approval. Mr. Smith complimented Mr. Collard on his work, but told Mr. Collard not to publish the article. Mr. Collard complied with this directive.

Mr. Collard asserts that he heard a rumor on August 9, 1994, that he was about to be discharged as a result of his articles and editorials. Mr. Collard telephoned *Lincoln Journal* publisher Ruth Adkins that evening and inquired about his employment status. Mr. Collard taped the conversation. In the conversation, Ms. Adkins stated that she was not certain whether the *Lincoln Journal*'s owners intended to fire Mr. Collard, that she believed Mr. Collard had done a good job, and that she would do what she could to see that Mr. Collard was not discharged. Despite this conversation, Ms. Adkins discharged Mr. Collard the next day. Present during the discharge was Larry Traylor, who had traveled from Fort Payne, Alabama, to

the newspaper's offices to be present when Ms. Adkins discharged Mr. Collard.

Mr. Collard asserts that Mr. Jackson and the Stowers family pressured the *Lincoln Journal*'s owners to discharge Mr. Collard. Mr. Collard claims that members of the Stowers family summoned Ruth Adkins to their offices periodically and told her to discharge or reprimand Mr. Collard. Mr. Collard also claims that members of the Stowers family contacted other employees of the defendants and pressured them to discharge Mr. Collard. Mr. Collard has not sued Mr. Jackson or any member of the Stowers family.

### B.

The defendants in this case—Smith Newspapers, Newspaper Management, and TLS—are Alabama corporations with their principal place of business in Fort Payne, Alabama. Sorting through the tangled web of the *Lincoln Journal*'s ownership and control requires greater tenacity than does reading Milton's *Paradise Lost*. At the time of Mr. Collard's discharge, Lincoln County Newspapers, Inc., (Lincoln Newspapers) owned the *Lincoln Journal*. Logan Media, Inc. owned Lincoln Newspapers. Donaldsonville Newspapers, Inc. (86.25%), Murray Newspapers, Inc. (6.25%), Shelton Prince (4.37%), and Charles Hurley (3.13%) owned Logan Media, Inc. The defendant TLS owned Donaldsonville Newspapers, Inc. Timothy L. Smith (96.08%), Teresa Smith (1.96%), and Frances Smith (1.96%) owned TLS.[1]

On September 1, 1993, Lincoln Newspapers entered into a management contract with the defendant Newspaper Management. In the contract, Newspaper Management agreed to provide "management consultation" services for the *Lincoln Journal*. The parties dispute the role that Newspaper Management played in the management and control of the *Lincoln Journal* and in Mr. Collard's discharge. At the time that the board of directors of Lincoln Newspapers entered into the management contract with Newspaper Management, the board of directors formally terminated its management contract with the defendant Smith Newspa-

pers. The parties also dispute whether Smith Newspapers continued to play a role in the management and control of the *Lincoln Journal* after its contract ended. These disputes are not material to the Court's decision.

### II.  Standard of Review

■■■ Under Rule 56(c) of the Federal Rules of Civil Procedure, to obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

■■■ Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

### III.  Wrongful Discharge in Contravention of Public Policy

Mr. Collard's first cause of action is for wrongful discharge in contravention of a sub-

---

1. Although TLS did not own 100% of the *Lincoln Journal*, TLS apparently does not dispute that it owned the *Lincoln Journal* and was Mr. Collard's employer.

stantial public policy of the State of West Virginia. Mr. Collard asserts that he was discharged in contravention of the substantial public policy principles guaranteed by the First and Fourteenth Amendments of the U.S. Constitution. The First Amendment provides in pertinent part: "Congress shall make no law ... abridging the freedom of speech, or of the press." Viewing the evidence in the light most favorable to Mr. Collard, as the Court must when reviewing the defendants' motion for summary judgment, the Court must assume that Mr. Collard was discharged because of the articles and editorials he wrote for the *Lincoln Journal* and that the *Lincoln Journal* previously had approved the publication of those same articles and editorials. The Court also must assume that Mr. Collard was discharged because of political and economic pressures from those unhappy with Mr. Collard's writings. Despite making these assumptions, the Court concludes that the West Virginia Supreme Court of Appeals, if asked to address this question, would find that Mr. Collard does not have a cause of action for wrongful discharge in contravention of a substantial public policy.

### A.

■ West Virginia follows the employment-at-will doctrine. Under this doctrine, an employer may discharge an employee at any time for any reason or no reason unless the parties have a employment contract that specifically provides otherwise. West Virginia recognizes an exception to this doctrine for situations in which the employer's motivation for discharging the employee "contravenes some substantial public policy principle." *Harless v. First National Bank in*

Fairmont, 162 W.Va. 116, 246 S.E.2d 270, 275 (1978). Public policy refers to those issues in which the public has an important interest and is derived only from "established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." *Birthisel v. Tri–Cities Health Services Corp.*, 188 W.Va. 371, 424 S.E.2d 606, 612 (1992). The existence of a substantial public policy is a question of law to be determined by this Court, not a question of fact for the jury. *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111, 114 (1984).

Since 1978 when the West Virginia Supreme Court of Appeals first recognized claims of wrongful discharge in violation of public policy, the court has found public policy violations in a variety of contexts.[2] In fact, only once, in *Birthisel, supra,* has the supreme court reached the opposite conclusion. The Court believes that this context is another in which the supreme court would not recognize a public policy cause of action.

### B.

■ A significant goal of the First Amendment's speech and press protections is to foster a "marketplace of ideas." To have a truly competitive marketplace, there must be no, or at least few, barriers to market entry. At the time of the First Amendment's adoption and throughout much of the succeeding century, such was the case in the "marketplace of ideas." Alexis de Tocqueville, for instance, wrote in 1835: "[N]othing is easier than to set up a newspaper." 1 Alexis de Tocqueville, *Democracy in America* 193 (New York, Vintage 1954) (1833); *see also Miami Herald Publishing Co. v. Tornillo,*

2. *See Roberts v. Adkins*, 191 W.Va. 215, 444 S.E.2d 725 (1994) (discharging employees for purchasing automobile from competitor of employer's second, unrelated business); *Lilly v. Overnight Transp. Co.*, 188 W.Va. 538, 425 S.E.2d 214 (1992) (discharging employee for refusal to drive vehicle with unsafe brakes); *Twigg v. Hercules Corp.*, 185 W.Va. 155, 406 S.E.2d 52 (1990) (discharging employee for refusal to submit to random drug testing); *Collins v. Elkay Mining Co.*, 179 W.Va. 549, 371 S.E.2d 46 (1988) (discharging employee for refusal to comply with employer's request that violated coal mine health and safety statutes); *McClung v. Marion County*

Comm'n, 178 W.Va. 444, 360 S.E.2d 221 (1987) (discharging employee for attempting to collect overtime pay); *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984) (discharging employee for refusal to take polygraph test); *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980) (discharging employee for seeking workers' compensation benefits); *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) (discharging employee for encouraging employer to comply with consumer protection laws).

418 U.S. 241, 248, 94 S.Ct. 2831, 2835, 41 L.Ed.2d 730 (1974). Today, although the information superhighway has increased competition in the "marketplace of ideas," *see generally The Message in the Medium: The First Amendment on the Information Superhighway,* 107 Harv.L.Rev. 1062 (1994), not everyone can compete by setting up a newspaper or other organ of media. As Owen M. Fiss notes: "The competition among [media] institutions is far from perfect, and some might argue for state intervention on a theory of market failure." Owen M. Fiss, *Why the State?,* 100 Harv.L.Rev. 781, 787–88 (1987); *see also Tornillo,* 418 U.S. at 248–51, 94 S.Ct. at 2835–36.

Mr. Collard makes an intriguing case in support of his claim of market failure. Mr. Collard asserts that the publishers of the *Lincoln Journal* voluntarily printed his articles and editorials, then discharged him for writing those same articles and editorials. Mr. Collard asserts that in doing so, the publishers caved in to economic pressure from outside political interests unhappy with Mr. Collard's writings. Finally, Mr. Collard asserts that the publisher's decision effectively stifled his speech and denied the public access to his ideas.

Mr. Collard certainly raises concerns that go to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). At the same time, the *Lincoln Journal*'s owners raise very important First Amendment concerns about the effect that compelling them to retain Mr. Collard as a reporter or to pay him money damages would have on their right to print what they want. *See Tornillo,* 418 U.S. at 256, 94 S.Ct. at 2838–39 (holding that right-of-reply statute violates First Amendment because it operates as regulation on what newspaper publisher prints). The Court concludes, however, that the West Virginia Supreme Court of Appeals, consistent with past practice, would resolve this case without resolving the constitutional questions involved. *See, e.g., Kathy L.B. v. Patrick J.B., Jr.,* 179 W.Va. 655, 371 S.E.2d 583, 589, n. 14 (1988); *Chesapeake & Potomac Telephone Co. v. Rose,* 172 W.Va. 452, 307 S.E.2d 620, 621–22 (1983).

## C.

■ Implicit in the state supreme court's decisions in its public policy cases is the principle that an employer may not be held liable for wrongful discharge when the employer has a *legitimate reason* for discharging an employee, regardless of any constitutional, statutory, or regulatory provision that might serve as the basis of a substantial public policy. *Cf. Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 511 A.2d 830, 843 (1986) (noting that employer, in spite of important public policy, may discharge employee if employer has legitimate reason for doing so), *appeal denied,* 514 Pa. 643, 523 A.2d 1132 (1987). In *Twigg v. Hercules Corp.,* 185 W.Va. 155, 406 S.E.2d 52 (1990), for instance, the court, despite concluding that employees have a right of privacy, did not adopt a *per se* rule precluding employers from conducting drug testing. Instead, the *Twigg* court identified two situations in which drug testing would be permissible: when the employer has a "reasonable good faith objective suspicion of an employee's drug usage" and when "an employee's job responsibility involves public safety or the safety of others." *Id.* at syl. pt. 2.[3] In this case, the Court believes that the state supreme court

---

**3.** The principle that an employer should not be held liable for wrongful discharge if the employer has a legitimate reason for discharging the employee is also consistent with case law about public employees discharged for exercising their First Amendment rights. In such cases, the Supreme Court has developed a balancing test to determine whether a public employer unconstitutionally discharged a public employee for protected speech. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). This balancing test requires a court to determine whether the government's "interest in the effective and efficient fulfillment of its responsibilities" outweighs the employee's interest in the protected speech. *Id.* at 150, 103 S.Ct. at 1691–92; *see also Joyner v. Lancaster,* 815 F.2d 20, 23 (4th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987).

would find that the First Amendment rights of the *Lincoln Journal*'s owners and the threat of financial harm provided the owners with legitimate reasons to discharge Mr. Collard and entitle them to summary judgment.[4]

### 1. First Amendment

■ The First Amendment rights of the *Lincoln Journal*'s owners provided them with a legitimate reason to discharge Mr. Collard. Judge Learned Hand has written that the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943), *aff'd*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). Judge Hand's classic formulation illustrates the dichotomy that traditionally arises in First Amendment cases: a person wishing to express himself or herself versus the government, by means of authoritative selection, attempting to censor that person. This case raises a wholly different issue because the owners of the *Lincoln Journal*, not the government, are the ones attempting to censor Mr. Collard, and those owners have First Amendment rights.[5]

Although the ultimate aim of the First Amendment is to assure a multitude of tongues from which the public can ascertain truth, courts have implemented the First Amendment's precepts, not by providing anyone who wishes to speak with a forum from which to speak, but by giving owners of newspapers and other media the right to print or to broadcast whatever they want. The United States Supreme Court has made it clear that a newspaper's owners have virtually an absolute right to choose what to print and what "to leave on the newsroom floor." *Tornillo*, 418 U.S. at 261, 94 S.Ct. at 2841 (White, J., concurring). In fact, the Supreme Court has identified the following as the only checks on a newspaper owner's power: "first, the acceptance of a sufficient number of readers—and hence advertisers—to assure financial success; and, second, the journalistic integrity of its editors and publishers." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 117, 93 S.Ct. 2080, 2094, 36 L.Ed.2d 772 (1973).

In light of the goal of assuring a "marketplace of ideas" from which the general public can ascertain truth, it may seem strange to some that courts have implemented the First Amendment's protections of speech and press by giving media owners the right to decide what to print and what not to print. There are two reasons for this. First, a laissez-faire approach encourages the expansion of media. Second, courts are ill-equipped to evaluate the content of speech.

A laissez-faire approach encourages a large number of media participants. When a person purchases a newspaper, that person purchases a forum from which to speak. If a court compels a newspaper owner to print a reporter's articles or to compensate a discharged reporter with money damages, the court restricts the owner's use of her forum and discourages her and others from creating additional fora. Court intervention—whether in the form of prior restraint or subsequent punishment—thus implicates significant First Amendment rights of a newspaper's owner and discourages the development of a "marketplace of ideas." *See Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 101–

---

4. The Court does not reach the issue of whether Smith Newspapers or Newspaper Management were Mr. Collard's employers. If not Mr. Collard's employers, of course, neither Smith Newspapers nor Newspaper Management could be held liable for wrongful discharge.

5. The defendants argue that the Court should grant summary judgment because the absence of state action makes the First Amendment inapplicable to this case. Numerous courts have dismissed causes of action for wrongful discharge in contravention of the public policy principles enunciated in the U.S. Constitution because of

the absence of state action. *See, e.g., Bell v. Ashland Petroleum Co., Inc.*, 812 F.Supp. 639, 640 n. 3 (S.D.W.Va.1993) (First Amendment—applying Kentucky law); *Monroe v. Consolidated Freightways Inc.*, 654 F.Supp. 661 (E.D.Mo.1987) (Fourth Amendment); *Rozier v. St. Mary's Hosp.*, 88 Ill.App.3d 994, 44 Ill.Dec. 144, 411 N.E.2d 50 (1980) (First Amendment). *But see Novosel v. Nationwide Ins. Co.*, 721 F.2d 894 (3d Cir.1983) (First Amendment). It is unclear whether the state supreme court would adopt such a *per se* rule. *See Twigg*, 406 S.E.2d at 56–57 (discussing absence of state action).

02, 99 S.Ct. 2667, 2669–70, 61 L.Ed.2d 399 (1979).

Furthermore, courts are ill-equipped to determine which ideas are true and which are not, which ideas are in the public interest and which are not, which ideas should be quashed and which should not. Realizing this, courts, as state actors, are reluctant to intervene in disputes involving private parties when that intervention would interfere with the exercise of one party's First Amendment rights. *See Tornillo,* 418 U.S. at 260, 94 S.Ct. at 2840–41 (White, J., concurring) (expressing concern about "heavy hand of government intrusion" in press); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 145, 93 S.Ct. 2080, 2107–08, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) (expressing concern about "intrusive editorial thumb of government"); *see also* syl. pt. 3, *Citizen Awareness Regarding Education v. Calhoun County Publishing, Inc.,* 185 W.Va. 168, 406 S.E.2d 65 (1991). The "marketplace of ideas" will never be free as long as a court determines what is in the public interest.

By this, the Court does not mean to minimize Mr. Collard's First Amendment rights. Were the government attempting to punish Mr. Collard for the articles and editorials that he wrote while employed by the *Lincoln Journal* or to prevent Mr. Collard from setting up his own newspaper, this Court gladly would intervene to protect Mr. Collard's First Amendment rights. The Court, however, cannot appropriate the *Lincoln Journal*'s printing press—paid for by the *Lincoln Journal*'s owners—for Mr. Collard's use or punish the *Lincoln Journal*'s owners for denying Mr. Collard access to it.

The Supreme Court's recent decision in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), illustrates this point. In *Hurley,* the Court concluded that Massachusetts could not compel private St. Patrick's Day parade organizers to include a homosexual rights group in their parade. In so doing, the Court likely denied the homosexual rights group access to a forum which would have provided the group with the most effective way of conveying its message. The *Hurley* Court clearly recognized that it could not correct inequalities in the ability to get one's message out. The Court could only protect the First Amendment rights of the homosexual rights group to hold its own parade or otherwise get its message out by a forum of its own creation.

The same holds true in this case. Even though Mr. Collard might best be able to market his ideas with the assistance of the *Lincoln Journal*'s printing press, the Court cannot compel the *Lincoln Journal*'s owners to give Mr. Collard access to it. The First Amendment guarantees Mr. Collard, the *Lincoln Journal*'s owners, and others only the freedom to compete as best each can without the government's help or hindrance—not a printing press.

Mr. Collard attempts to distinguish this case from right-of-access cases like *Tornillo* and *Hurley* on the ground that the *Lincoln Journal*'s owners gave up some of their First Amendment rights and transferred those rights to Mr. Collard when they hired him. Mr. Collard also attempts to distinguish this case on the ground that the defendants actually authorized and approved the articles and editorials written by him before they were published. Mr. Collard argues that once a newspaper hires a reporter or approves an article, the newspaper forfeits its First Amendment rights vis-á-vis the reporter. The Court disagrees with both arguments.

In *Hurley,* the Supreme Court addressed a similar forfeiture argument. The plaintiffs in *Hurley* argued that parade organizers, by freely allowing other groups to participate in the parade, forfeited their First Amendment right to exclude the plaintiffs from the parade. In concluding that parade organizers did not forfeit this right, the *Hurley* Court wrote:

> [A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit ... themes to isolate an exact message as the exclusive subject matter of the speech. Nor ... does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication. Cable operators, for example,

are engaged in protected speech activities even when they only select programming originally produced by others.... For that matter, the presentation of an edited compilation of speech generated by other persons is the staple of most newspapers' opinion pages, which, of course, fall squarely within the core of First Amendment security.

*Id.* —— U.S. at ——, 115 S.Ct. at 2345–46 (internal citations omitted).

The *Lincoln Journal*'s owners likewise did not forfeit their First Amendment rights vis-à-vis Mr. Collard merely by hiring him or by printing his articles and editorials. The following illustrates the fundamental flaw with Mr. Collard's argument. Assume that the *Lincoln Journal*'s owners published books, instead of newspapers, and that the owners previously had published one or more of Mr. Collard's books. No one would argue that the owners forfeited their First Amendment rights by publishing Mr. Collard's earlier books and thus could be compelled, absent a contract, either to publish his future books or to compensate him for not publishing them.

## 2. Financial Harm

The possibility of significant financial harm to the *Lincoln Journal*'s owners provided them with yet another legitimate reason to discharge Mr. Collard. In recognizing a cause of action for wrongful discharge in contravention of a substantial public policy, the West Virginia Supreme Court of Appeals certainly never intended to force employers to retain employees who would cause them to suffer significant financial harm or possibly to go out of business. Through no fault of the *Lincoln Journal*'s owners, Mr. Collard became such an employee.

The alleged facts of a case currently before the U.S. Supreme Court illustrate the dilemma that a small newspaper faces when an advertiser threatens to pull his or her advertisements. *See Umbehr v. McClure*, 44 F.3d 876 (10th Cir.), *cert. granted*, —— U.S. ——, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995) (No. 94–1654). In *Umbehr*, the owner of an independent newspaper published a series of articles critical of the Wabaunsee County (Kan-

sas) Commission, a state actor. Brief for Respondent at 3–8. Shortly thereafter, the Commission pulled all legal notices and advertisements from the newspaper and placed them in a smaller newspaper in a neighboring community. *Id.* at 8. The newspaper's owner was forced to sell. *Nina Totenburg, All Things Considered: Lawyers Argue First Amendment Case Before High Court* (National Public Radio broadcast, November 28, 1995).

If the Court were to recognize a cause of action for wrongful discharge in contravention of a substantial public policy, the Court would effectively place the *Lincoln Journal*'s owners in a no-win situation. They either would have to reinstate Mr. Collard (and presumably publish Mr. Collard's writings or else let him sit idly) or would have to compensate him with money damages. Of course, if the *Lincoln Journal*'s owners reinstated Mr. Collard, they would suffer the loss of advertising revenue and potentially their source of financial livelihood. The state supreme court surely never intended for the public policy exception to create such a result.

## IV. Duty of Good Faith and Fair Dealing

■ Mr. Collard's Second Amended Complaint also alleges a cause of action for breach of the duty of good faith and fair dealing. The West Virginia Supreme Court of Appeals recently held that there is no implied covenant of good faith and fair dealing in the context of an at-will employment contract. *Miller v. Massachusetts Mutual Life Insurance Co.*, 193 W.Va. 240, 455 S.E.2d 799, 803 (1995) (per curiam). Mr. Collard attempts to distinguish *Miller* on the ground that Lincoln Newspapers created a contractual duty to exercise good faith and fair dealing in its policy manual and by the actions of *Lincoln Journal* publisher Ruth Adkins.

■ Under West Virginia law, "[a] promise of job security contained in an employee handbook ... constitutes an offer for a unilateral contract; and an employee's continuing to work ... constitutes an acceptance and sufficient consideration to make the em-

ployer's promise binding and enforceable." Syl. pt. 5, *Cook v. Heck's, Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986). "An employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons." *Id.* at syl. pt. 6. At the same time, West Virginia courts will uphold a disclaimer in an employee handbook that gives the employer unfettered discretion to discharge employees as long as the disclaimer is "sufficiently clear, conspicuous, and understandable so that employees will know that the handbook provides them with no protection and it only is intended to benefit ... the employer." Syl. pt. 6, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995).

Lincoln Newspapers' policy manual contains three disclaimers that clearly indicate that Lincoln Newspapers did not intend for the policy manual to be an employment contract. The first appears on page 1 and provides: "[T]his manual is not to be considered a contract of continued employment as the company reserves the right to discipline or discharge any employee at will with or without cause at any time." Similarly, under "General Policies: Management Prerogatives" on page 10, the manual provides: "The company maintains the right to hire and discharge, suspend, discipline, promote, demote, and transfer employees at will and to release any employee or employees for lack of work, or for other purposes it deems proper." Finally, under "Separations: Discipline and Discharge" on page 18, the manual provides: "Employment and compensation may be terminated with or without cause, and with or without notice, at any time, at the option of the company."

Mr. Collard does not contend that these three provisions are not "clear, conspicuous, and likely to be understood" by him. Rather, Mr. Collard cites three sentences out of a twenty-two page policy manual that he claims make the policy manual ambiguous. The first provision, which appears on page 4 under a section entitled "Wage and Salary Administration: Promotions and Salary Increases," provides: "All employment promotions, demotions and terminations shall be based solely on merit and efficiency." This provision appears in a section of the policy manual ("Promotions and Salary Increases") in which one normally would not expect to find a guarantee of job security. Furthermore, the policy manual goes on to say immediately after the above-cited language: "Management ... shall have the final authority in these matters." This sentence clearly indicates an intent by Lincoln Newspapers not to override the contract disclaimers contained in other sections of the policy manual. The first provision therefore does not create ambiguity sufficient for a reasonable employee to conclude that the policy manual provides contractual protections.

The second provision, which appears on page 10 under a section entitled "General Policies: Open Shop Policy," provides: "Fair treatment for all employees is the company standard and will continue to be the standard. It is the policy of the company to treat people as individuals, as well as members of a team, on the basis of each person's ability, skill." This provision likewise appears in a section ("Open Shop Policy") in which one normally would not expect to find a guarantee of job security. Additionally, a reasonable employee surely would not believe that such vague language was intended to provide the employee with contractual protection, especially in light of the fact that the second provision appears on the same page as one of the disclaimers. The second provision does not make the policy manual an enforceable employment contract.

■ Mr. Collard also argues that Ruth Adkins told him that he could be fired only for cause. Mr. Collard cites Ms. Adkins's statements in her deposition that she told Lyle Stowers that she did not fire employees without a reason and that she conveyed the substance of this conversation to Mr. Collard. Even assuming that Ms. Adkins said these things, her statements can hardly be characterized as creating new contractual terms between the parties. More importantly, the policy manual clearly precludes the creation of oral contracts abrogating an employee's at-will status. Page 1 provides: "Policies of this manual can only be changed in writing by management. Any verbal commitments

made in violation of this manual are not recognized by the company." In addition, the language following the disclaimer on page 18 provides: "No supervisor of the company has the authority to enter into any employment for any specified period of time, or to make any agreement contrary to the foregoing." Ms. Adkins clearly could not create a contractual obligation on behalf of any of the defendants to discharge Mr. Collard only for cause.

In summary, the defendants are entitled to summary judgment on Mr. Collard's cause of action for breach of a duty of good faith and fair dealing because West Virginia does not recognize such a cause of action in the at-will context and neither the policy manual nor Ms. Adkins's words created contractual obligations abrogating Mr. Collard's at-will status. The Court does not reach the question of whether there is a cause of action for breach of a duty of good faith and fair dealing in the context of an action arising under an employment contract. *See Miller*, 455 S.E.2d at 803 n. 5 (quoting Professor Monique C. Lillard favorably: "[T]he concept of good faith and fair dealing is too vague to be helpful to either party or even to the court."). This question the Court leaves for a later day.

## V. Tortious Interference

■■■■ Mr. Collard brings his third cause of action against Smith Newspapers and Newspaper Management for tortious interference with his advantageous employment relationship. Under West Virginia law, Mr. Collard must prove the following to establish a prima facie case of tortious interfer-

ence: (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. Syl. pt. 2, *Torbett v. Wheeling Dollar Savings & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983). West Virginia recognizes the following defenses to a tortious interference claim: "legitimate competition between the plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper." *Id.*

■■■■ First, Smith Newspapers argues that it is entitled to summary judgment because it played no role in Mr. Collard's discharge. Smith Newspapers bases this assertion on documentary evidence that its management services contract with Lincoln Newspapers ended in September 1993. The Court concludes that there is a factual dispute about whether Smith Newspapers continued to play a management role after September 1993. Accordingly, the Court denies Smith Newspapers' motion for summary judgment on that ground. Second, Smith Newspapers and Newspaper Management argue that they are entitled to summary judgment because of their business relationship with Lincoln Newspapers. The Court concurs and grants summary judgment on the ground that they are entitled to the defense of responsibility for another's welfare.[6]

6. Much of the evidence presented to the Court supports the conclusion that TLS, Smith Newspapers, and Newspaper Management are one and the same for all practical purposes. If so, Smith Newspapers and Newspaper Management cannot be held liable for tortious interference because they were not parties outside the employment relationship or expectancy.

To begin with, all three are located in Fort Payne, Alabama; all three appear to be owned wholly or in part by members of the Smith family; and all three have retained one firm to represent them in this case. Furthermore, the actions and statements of those who should have known the differences between these corporations, if any existed, only confuse the issue.

Larry Traylor—who was present when Ms. Adkins discharged Mr. Collard—stated in his deposition that he was employed as a group manager for Newspaper Management at the time of Mr. Collard's discharge. Yet the January 1994 newsletter of Smith Newspapers stated that Mr. Traylor had moved to full time group manager duties for Smith Newspapers. Terry Rogers, whom the newsletter listed as assuming responsibility for all of Smith Newspapers' computer room operations, signed some of Mr. Collard's checks. The "Smith Newspaper Group Benefit Trust" provided Mr. Collard with health care coverage and mailings about that coverage were sent in envelopes containing the return address of "Smith Newspapers, Inc."

Although the state supreme court has not specifically addressed the scope of this defense, the court traditionally relies on the *Restatement (Second) of Torts* when it defines the elements of torts and the scope of defenses. *Torbett,* 314 S.E.2d at 172. Section 770 of the *Restatement (Second) of Torts* provides: "One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relation with another, does not interfere improperly ... if the actor—(a) does not employ wrongful means and (b) acts to protect the welfare of a third person." The written management services contract between Newspaper Management and Lincoln Newspapers illustrates that the parties contemplated that the management services company would be responsible for a significant portion of the economic welfare of Lincoln Newspapers.[7] The agreement specifically provided that the management services company would "consult with and ... counsel and advise [Lincoln Newspapers] on any problem or question, arising in connection with the management of [Lincoln Newspapers's] businesses." The agreement also provided that the management services company would "assist in the hiring of personnel."

Mr. Collard has not offered a scintilla of evidence that Smith Newspapers or Newspaper Management did anything more than fulfill the terms of their respective agreements to protect the economic welfare of Lincoln Newspapers. Furthermore, Mr. Collard has not offered a scintilla of evidence that Smith Newspapers or Newspaper Management did anything more than persuade Mr. Collard's employer to discharge him.

Comment d of *Restatement (Second)* § 770 states that persuasion is not a wrongful means. Accordingly, Smith Newspapers and Newspaper Management are entitled to summary judgment on the tortious interference claim.

## VI. Conclusion

Throughout this opinion, the Court has assumed that Mr. Collard's discharge led to a failure of the "marketplace of ideas." The standards for reviewing motions for summary judgment require no less when there are factual disputes regarding such matters. In parting, however, the Court must note its firm belief that there has been no failure of the "marketplace of ideas" in this case. During the last year, television stations and newspapers have reported extensively about the controversies surrounding the consolidation of Lincoln County's public schools. Many of these reports and articles have addressed the precise issues that Mr. Collard sought to address in the *Lincoln Journal.* Furthermore, yet another newspaper has begun publication in Lincoln County. Presumably, it will offer—as competing newspapers traditionally do—a different perspective than the *Lincoln Journal* on the issues that concern Lincoln County's citizens.

In American society, market failures rarely occur. The reason: when there is a shortage of some item in the marketplace, some enterprising individual or group will step in to fill the void. The Court believes that this case illustrates that the same holds true for the "marketplace of ideas." Regardless of which version of events one accepts, there can be little doubt that a free press has provided all sides with a full and fair opportunity to get their thoughts "accepted in the

---

Ms. Adkins, publisher of the *Lincoln Journal,* is another person whom one would expect to understand the relationship between the various defendants. She stated in her deposition that she did not. At one point, she identified David Smith, who states in an affidavit that he is president of TLS, as the head of Newsaper Management. At another point, she identified David Smith and Larry Traylor as group managers for Smith Newspapers. During her taped conversation with Mr. Collard shortly before his discharge, she identified Smith Newspapers as the entity contemplating whether to discharge Mr. Collard. Additionally, Terry L. Headley, a for-

mer staff writer for the *Lincoln Journal,* has signed an affidavit stating that he understood that Smith Newspapers, Inc. owned the *Lincoln Journal.*

7. The parties did not provide the Court with a copy of any written management agreement between Smith Newspapers and Lincoln Newspapers. Even so, the Court finds no evidence in the record to indicate that the terms of such an agreement would differ materially from the agreement between Newspaper Management and Lincoln Newspapers.

competition of the market." John Milton and John Stuart Mill and Oliver Wendell Holmes believed that from such a free press would come right conclusions. As Learned Hand has said: "To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943), *aff'd,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

For the reasons outlined above, the Court **GRANTS** the defendants' motion for summary judgment.