**Michele Locastro RIVOLI, Plaintiff,**

v.

**GANNETT CO., INC., Defendant.**

**No. 03–CV–6429L.**

United States District Court, W.D. New York.

July 29, 2004.

---

David Rothenberg, Gieger and Rothenberg, LLP, Rochester, NY, for Plaintiff.

Christopher D. Thomas, Nixon Peabody LLP, Rochester, NY, for Defendant.

### DECISION AND ORDER

LARIMER, District Judge.

Plaintiff, Michele Locastro Rivoli, commenced this action against her former employer, Gannett Co., Inc. ("Gannett"), alleging claims under 42 U.S.C. § 1983. Gannett has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted, and the complaint is dismissed.

### BACKGROUND

Although the fifty-page complaint contains lengthy factual allegations, they may be summarized as follows. Plaintiff was formerly a reporter for the *Rochester Democrat and Chronicle* ("D & C") newspaper, which is owned by Gannett, and distributed in Rochester, New York.

In the Fall of 1999, plaintiff discovered that the Monroe County District Attorney's Office ("D.A.'s Office") had mishandled certain felonies in a number of respects.[1] With her editors' approval,

---

1. The particular ways in which the felonies were allegedly mishandled is not important for purposes of deciding the motion to dismiss.

plaintiff undertook to investigate the matter further. When she did so, she discovered even more problems concerning unresolved felony cases.

Plaintiff's first story on the subject was published on page 1 of the February 18, 2001 D & C. Complaint ¶ 51. Several more stories followed, as well as editorials critical of the D.A.'s Office. (The editorials were not written by plaintiff.)

Howard Relin, the then-District Attorney, publicly denied the stories' accusations, or attempted to explain them away or to shift blame to others. At an interview on February 27, 2001, Relin allegedly told plaintiff that she had an ax to grind, that she was unprofessional, and that she should not call the D.A.'s Office because no one would speak to her. Complaint ¶ 65.

At around the same time, Relin began calling plaintiff's editors and members of Gannett's management to complain about the stories. After one such phone call, plaintiff's editors summoned plaintiff to a meeting, where they told her that Relin was powerful, had been a good source of news stories over the years, and should be treated "nicely." Complaint ¶ 67. They also told her that they had agreed that any further questions for Relin about the subject of the stories would be submitted to him in written form. Plaintiff was allowed to continue her investigation, however, and additional stories by her on the subject were published in the D & C.

On March 13, 2001, at Relin's request, he met with plaintiff and several members of the D & C's top management, including Publisher Dave Hunke, and Executive Editor Karen Magnuson. The meeting was relatively cordial, and Relin indicated that he was open to an independent audit of his office concerning the questioned felony prosecutions. Complaint ¶¶ 78–80.

Later that day, however, Relin called the D & C and said that he had changed his mind, and would not agree to an outside audit. Complaint ¶ 83. More stories and negative editorials followed over the next several days.

As plaintiff pursued her investigation, she continued to discover more problems at the D.A.'s Office. On March 28, 2001, she asked her editors for permission to investigate and report on one such problem concerning unclaimed bail money. The complaint does not state whether they granted that request; it does allege, however, that later that day, a "confidential source" told plaintiff that her job was in jeopardy. Complaint ¶ 118.

Some time in late March 2001, Relin suggested that plaintiff's editors contact certain individuals to ask them for their opinions of plaintiff. They did so.

The next day, two of plaintiff's editors, Robert Finnerty and Rick Armon, called plaintiff and told her that they were not going to run any more stories about the pending unresolved felonies. They told her that this was a "business decision" that they had made based on conversations with Relin and the individuals whose names had been given to them by Relin. Complaint ¶ 126. The editors refused to name those individuals, but they told plaintiff that those persons had questioned plaintiff's objectivity.

Finnerty and Armon also told plaintiff that the decision to "cool" her investigation had been approved by Magnuson, the Executive Editor. A short time after this conversation, plaintiff spoke to Finnerty, Armon, and Magnuson, and Magnuson reiterated that stopping the stories was a "business decision." Complaint ¶ 129.

About an hour later, Magnuson called plaintiff and asked her if she knew what slander was. Magnuson told plaintiff that if plaintiff were to "tell anyone what we did, we'll consider it slander against the company." Complaint ¶ 130. Magnuson

added that plaintiff's life would become unpleasant if she did not "play ball." *Id.*

Magnuson also told plaintiff, though, that plaintiff was going to be given an award for her stories about the D.A.'s Office. A ceremony was held at the D & C offices that afternoon, and plaintiff was given an award and a $125 check. After the ceremony, though, she was again admonished not to discuss the situation with anyone. Complaint ¶¶ 133–34.

Plaintiff and her editors continued to clash over the matter, however. On March 30, plaintiff learned that Relin was going to hold a press conference to discuss felony cases. When she told Finnerty about this, he said, "That couldn't be true; that's not part of the...." "Deal, Bob?," plaintiff responded. "It isn't part of the deal?" Finnerty made no reply. Complaint ¶ 142.

Later that day, Finnerty told plaintiff that Magnuson was angry at Relin and that Magnuson wanted plaintiff to cover Relin's April 2 press conference. On April 3, the D & C published a story by plaintiff about the conference, at which Relin announced the formation of a "Permanent Committee to Track and Resolve Felony Cases." The story also reported that Governor Pataki had asked the New York State Commission of Investigation ("COI") to look into the allegations about the mishandling of felonies by the D.A.'s Office. This turned out to be plaintiff's last published story about the D.A.'s Office. Complaint ¶¶ 143–46.

Again, plaintiff and her editors continued to butt heads over matters in the D.A.'s Office. Finnerty told her that no more stories on the topic would be published until after the COI investigation was complete. Plaintiff again brought up the alleged "deal" with Relin. Finnerty told her that if she did not stop talking about the "deal," she would never again write a front-page story. Complaint ¶ 151.

Finnerty also told plaintiff that if she did tell anyone about the "deal," he would deny its existence. Plaintiff responded that it did not matter because she had tape recorded prior telephone conversations with Finnerty when plaintiff was initially pulled from the stories. Finnerty told plaintiff that she was off the stories for good, and that she would never write another page-one story. Complaint ¶¶ 152–54.

On April 4, 2001, a meeting was held with plaintiff, her union president, Finnerty and Magnuson. At one point, plaintiff mentioned that Magnuson had called her at home and threatened plaintiff with a slander lawsuit. Magnuson initially denied this, but when Finnerty told her that plaintiff had been taping her telephone conversations, Magnuson admitted having made both the call and the threat. Complaint ¶¶ 157–58.

On June 18, 2001, plaintiff was seen by the D & C's publisher, David Hunke, who told her to appear at his office the next day, without a union representative, and with her tape recordings. When she refused, he told her, "Keep this up and we're going to crush you." Complaint ¶ 203.

As plaintiff was leaving work that day, a security guard stopped her, in Finnerty's presence, and demanded to see the contents of her purse. When plaintiff responded that she would only consent to a search in the presence of her lawyer, a union representative and a television news crew, the guard looked at Finnerty, who shook his head, and plaintiff was allowed to leave. Complaint ¶¶ 203–04.

On June 25, 2001, a Rochester television station ran a story about plaintiff's removal from the investigation of the D.A.'s Office. The story suggested that this might have been done as a courtesy to Relin because of an incident that had occurred in 1996, when the D.A.'s Office allegedly gave

a "break" to the wife of the D & C's then-publisher concerning a charge of driving while intoxicated ("DWI"). Complaint ¶ 208. In response to the story, Relin stated that "the fact that she was the wife of the Gannett publisher had nothing whatsoever to do with the case." Complaint ¶ 209. He also denied having any involvement in the decision by the D & C to remove plaintiff from the investigation concerning his office.

Some time after being removed from the investigation, plaintiff was reassigned to the "Our Towns" section of the D & C, which reports mostly on suburban matters. Plaintiff alleges, in sum and substance, that this was a dead-end job, and that she thereafter had no realistic hope of advancement at the D & C.

Although the complaint contains numerous additional factual allegations, essentially they detail the ongoing, deteriorating relationship between plaintiff and her editors, the D & C's eventual refusal to publish any more stories critical of Relin or the D.A.'s Office concerning the pending unresolved felonies, and Gannett's continued denial of any "deal." The latter included Magnuson's denial of any improprieties after the *Washington Post* published an article, entitled, "Rochester Paper Benches Honored Reporter," about plaintiff's removal from the investigation. Complaint ¶ 234.

On September 4, 2002, plaintiff resigned from her job at the D & C. She filed this lawsuit about a year later.

The complaint asserts one cause of action under § 1983. Plaintiff alleges that Gannett, through its officers and employees, entered into an agreement with a state actor, Relin, to deny plaintiff her First Amendment rights to freedom of speech and freedom of the press, and that, acting in concert with that state actor, Gannett did deny plaintiff those constitutional rights. Plaintiff also alleges that

Gannett, acting in concert with Relin, punished plaintiff in retaliation for her exercise of her First Amendment rights. Plaintiff seeks compensatory and punitive damages, and attorney's fees.

## DISCUSSION

### I. Defendant's Motion to Dismiss

### A. "Under Color of State Law" Requirement–General Principles

 Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

In order to state a claim under § 1983, therefore, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Action taken "under color" of law "has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (quoting *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)).

In this case, plaintiff has elected not to sue the state official, Relin, but names a private entity, Gannett. Gannett contends, therefore, that the complaint does not allege facts showing state action. Plaintiff

has only alleged that Gannett, a private actor, made decisions about what it wished to print in its own newspaper.

■ There are circumstances, however, in which a private entity can be found to have acted under color of state law. A private actor "acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir.2002). *See Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Price,* 383 U.S. at 794, 86 S.Ct. 1152.

■ On a motion to dismiss for failure to state a claim, dismissal is not warranted unless "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *accord In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.), *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001). At the same time, however, the Second Circuit has stated that a "merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello,* 292 F.3d at 324. While the plaintiff need not satisfy some "heightened" pleading standard, and instead need only comply with Rule 8(a)'s liberal system of "notice pleading," *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), it is nonetheless true that the facts that are pleaded must provide a basis for a reasonable inference of state action, for the Court is not obligated to draw unreasonable inferences in plaintiff's favor, or to accept plaintiff's conclusions of law. *See,*

*e.g., Ileto v. Glock Inc.,* 349 F.3d 1191, 1200 (9th Cir.2003) ("we do not accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations"); *Hickey v. O'Bannon,* 287 F.3d 656, 658 (7th Cir.2002) ("we are not obliged to accept as true legal conclusions or unsupported conclusions of fact"; finding that plaintiffs "failed to plead facts that, if true, state a constitutional or section 1983 violation as a matter of law"); *Wiles v. Capitol Indem. Corp.,* 280 F.3d 868, 870 (8th Cir.2002) (court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations"); *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 184 (3d Cir.2000) (court "need not accept as true 'unsupported conclusions and unwarranted inferences' " and should address plaintiffs' allegations in a "realistic, rather than a slavish, manner") (quoting *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 n. 13 (3d Cir.1998)), *cert. denied,* 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001); *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999) ("A court is not required, however, to accept a plaintiff's summary allegations or unwarranted legal conclusions in ruling on a motion to dismiss"); *Oladeinde v. City of Birmingham,* 963 F.2d 1481, 1485 (11th Cir.1992) (on motion to dismiss, court need only accept "well-pleaded facts" and "reasonable inferences drawn from those facts"), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993); *accord Lesavoy v. Lane,* 304 F.Supp.2d 520, 527 (S.D.N.Y.2004).

■ "[T]he ultimate resolution of whether an actor was ... functioning under color of law is a question of law for the court." *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 344 n. 7 (4th Cir.2000), *cert. denied,* 531 U.S. 1126, 121

S.Ct. 882, 148 L.Ed.2d 790 (2001); *accord Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir.2002); *Nieto v. Kapoor*, 268 F.3d 1208, 1215 (10th Cir.2001). In making that determination, I am aware that there is no simple litmus test for determining state action. Rather, the Supreme Court has directed that courts take a case-by-case approach, "sifting facts and weighing circumstances" before deciding whether a private actor's conduct can properly be deemed state action. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *accord McDade v. West*, 223 F.3d 1135, 1139 (9th Cir.2000) ("It is ... a truism by now that there is no rigid formula for measuring state action for purposes of section 1983 liability"); *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 18 (1st Cir.1999) ("The line of demarcation between public and private action, though easily proclaimed, has proven elusive in application"); *Graseck v. Mauceri*, 582 F.2d 203, 204 (2d Cir.1978) (the question "whether conduct of a fundamentally private institution ... constitutes 'state action,' [is] one of the more slippery and troublesome areas of civil rights litigation"), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979).

There are, nonetheless, some general principles and factors that may come into play. The Second Circuit summarized a number of these in *Tancredi v. Metropolitan Life Ins. Co.*, 316 F.3d 308 (2d Cir.), *cert. denied*, 539 U.S. 942, 123 S.Ct. 2610, 156 L.Ed.2d 628 (2003):

> When analyzing allegations of state action, we begin by identifying the specific conduct of which the plaintiff complains. In order to satisfy the state action requirement where the defendant is a private entity, the allegedly unconstitutional conduct must be fairly attributable to the state. Conduct that is ostensibly private can be fairly attributed to the state only if there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself. State action may properly be found where the state exercises coercive power over, is entwined in the management or control of, or provides significant encouragement, either overt or covert to, a private actor, or where the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies.

*Id.* at 312–13 (internal quotes and citations omitted). *See also Johnson v. Rodrigues (Orozco)*, 293 F.3d 1196, 1202–03 (10th Cir. 2002) (describing "public function" test, "nexus" test, "joint action" test, and "symbiotic relationship" test), *cert. denied*, 537 U.S. 1111, 123 S.Ct. 893, 154 L.Ed.2d 783 (2003).

**B. Whether "State Action" Is Adequately Pleaded in the Case at Bar**

■ Applying these principles to the case at bar, I find that plaintiff has not adequately pleaded state action, and that she has therefore failed to state a claim under § 1983. Although plaintiff does allege that there was an agreement or "deal" between Gannett and Relin, she has not alleged a sufficient nexus between those two actors with respect to any actions taken, or threats made, against plaintiff by Gannett.

In analyzing plaintiff's allegations, it is important to distinguish between the two different sets of acts about which she complains: first, Gannett's decision to take plaintiff off the investigation into the D.A.'s Office, and to "cool" the story; and second, Gannett's alleged retaliatory actions against plaintiff (such as reassigning her to the "Our Towns" section) and its

threats to "crush" her, sue her for slander, etc.

■ As to the former, a "reporter has no free-standing First Amendment right to have her articles published by a privately-owned newspaper for which she works." *Manson v. Little Rock Newspapers, Inc.,* 42 F.Supp.2d 856, 865 (E.D.Ark.1999), *aff'd,* 200 F.3d 1172 (8th Cir.), *cert. denied,* 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 124 (2000). Rather, the rights of members of the news media are "coextensive with and do not exceed those of members of the public in general." *In re Greensboro News Co.,* 727 F.2d 1320, 1322 (4th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). Thus, just as the First Amendment does not require a private publication to publish any submissions by an outsider, *see Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256–58, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); *Leeds v. Meltz,* 85 F.3d 51 (2d Cir.1996); *Knox County Local, Nat'l Rural Letter Carriers' Ass'n v. National Rural Letter Carriers' Ass'n,* 720 F.2d 936, 939 (6th Cir.1984), neither does it require a privately owned newspaper to publish any particular stories or articles written by its own reporters. *See Collard v. Smith Newspapers, Inc.,* 915 F.Supp. 805, 813 (S.D.W.Va.1996) (newspaper owners' discharge of editor for writing editorials critical of certain public officials did not violate state policy in favor of freedoms of speech and of the press; "The First Amendment guarantees Mr. Collard, the *Lincoln Journal'*s owners, and others only the freedom to compete as best each can without the government's help or hindrance-not a printing press").

■ On the contrary, *Gannett* has a First Amendment right to determine the contents of its own publications. *See Miami Herald,* 418 U.S. at 258, 94 S.Ct. 2831; *McClellan v. Cablevision of Connecticut, Inc.,* 149 F.3d 161, 167 n. 12 (2d Cir.1998) ("a newspaper publisher has a First Amendment right to control the editorial content of the newspaper"); *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1271 (10th Cir.1989) ("the act of publication and the exercise of editorial discretion concerning what to publish are protected by the First Amendment"). That right necessarily includes the right to decide not only what to *in*clude, but what to *ex*clude from the D & C. *See Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.,* 306 F.3d 806, (9th Cir. 2002) (television network's decision not to include certain information in news report was editorial decision protected by the First Amendment); *Collard,* 915 F.Supp. at 812 ("The United States Supreme Court has made it clear that a newspaper's owners have virtually an absolute right to choose what to print and what 'to leave on the newsroom floor' "); (quoting *Tornillo,* 418 U.S. at 261, 94 S.Ct. 2831 (White, J., concurring)).

It is true that, if a governmental body or official *interferes* with a newspaper's decisions about what to publish or not publish, that may violate the *newspaper's* First Amendment rights. *See, e.g., Miami Herald,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (coerced right of reply to newspaper editorials). But, there is no such claim here. All that plaintiff has alleged is that Relin and Gannett reached some type of "deal"-in other words, an agreement-that Gannett would stop running stories about the alleged malfeasance in the D.A.'s Office over the handling of felony cases. There is no allegation that Relin misused his powers as District Attorney to coerce Gannett into this agreement, however. *See Vander Linden v. Wilbanks,* 128 F.Supp.2d 900, 903 (D.S.C. 2000) (newspaper editor and publisher were not state actors by virtue of their accepting allegedly false political advertisements; "Plaintiffs never even made an allegation that defendants were coerced by

the state into publishing the advertisements or that the state had delegated any power to defendants"). On the facts alleged, there was no state interference or coercion involved.

There is a suggestion in the complaint that Gannett may have decided to "cool" the investigation because plaintiff's editors viewed Relin and the D.A.'s Office as good sources for news and that they did not want to alienate him, for fear of losing those sources. For example, plaintiff alleges that when Relin became angry at her during an interview, he told her "not to call the District Attorney's Office, because no one would be talking to her." Complaint ¶ 65. She also alleges that her editors told her that Relin "was powerful, had been a good source for the defendant for many years, and should be treated 'nicely.'" Complaint ¶ 67.

All that these allegations suggest, however, is that Gannett decided that continuing to publish these stories [2] was not worth angering Relin to the point where he stopped providing the D & C with newsworthy information. That was Gannett's prerogative, however, and it does not convert its actions into those of the state. The possibility of angering a public official is always a factor that will enter into the calculus when a newspaper is deciding whether to run a story that criticizes that official or his office. Plaintiff may view Gannett as having abdicated its journalistic responsibilities by giving that factor as much weight as it did (if that was in fact the case), but the fact remains that it was Gannett's decision to make. It did so as a private actor, and therefore did not-indeed, could not-violate plaintiff's First Amend-

ment rights. *See Manson,* 200 F.3d at 1173 ("Simply put, the defendant is a private entity, not a governmental entity, and thus is legally incapable of violating anyone's First Amendment rights. Any First Amendment rights germane to this case are those of the defendant and its newspaper, not those of Manson, a reporter employed in service of the newspaper").

Even assuming that Gannett got something from Relin in return for its "cooling" of the investigation-and there is no express allegation that it did-I find no state action with respect to plaintiff's claims. In fact, the complaint does not allege any express *quid pro quo* between Relin and Gannett. At most, there is a suggestion that Gannett was concerned about the possibility that Relin would no longer be a good source.

Even if Relin had openly warned plaintiff's editors that he might turn off the information tap, however, there is nothing unconstitutional about that. Plaintiff has cited no authority for the proposition that a government official has a general obligation to speak to the news media, or that he cannot pick and choose the reporters or news organs with whom he wishes to associate. Relin's ability to give or deny the D & C newsworthy information in the future may have given his concerns some weight, but that does not amount to the kind of governmental action that would give rise to a First Amendment violation. *See Penthouse Int'l. Ltd. v. Meese,* 939 F.2d 1011, 1015 (D.C.Cir.1991) (finding no First Amendment violation for prior restraint in the "absence of some actual or threatened imposition of governmental power or sanction"), *cert. denied,* 503 U.S. 950, 112 S.Ct.

---

**2.** It should also be noted that the complaint itself shows that Gannett did not simply bring to a screeching halt any stories and editorials about the problems at the D.A.'s Office. The complaint alleges that there were stories in the D & C on this topic on a number of occasions as late as May 26, 2002, *see* Complaint ¶¶ 170, 174, 199, 200, 219, 335, and 337, as well as editorials expressing concern about those problems on April 4, May 2, and May 24, 2001. Complaint ¶¶ 147, 180, and 181.

1513, 117 L.Ed.2d 650 (1992); *Gaston v. Gavin,* No. 97 Civ. 1645, 1998 WL 7217, at *4 (S.D.N.Y. Jan. 8, 1998) (no First Amendment violation where "[t]he plaintiff d[id] not indicate that any defendant used, or threatened to use, the coercive power of the government against the plaintiff to prevent publication of the article").

In addition, Relin certainly had a right of his own to be openly critical of plaintiff's stories, the D & C's editorials, and for that matter of plaintiff herself. *See Penthouse Int'l,* 939 F.2d at 1016 ("If the First Amendment were thought to be violated any time a private citizen's speech or writings were criticized by a government official, those officials might be virtually immobilized"); *Gaston,* 1998 WL 7217, at *4 ("there is ... no constitutional prohibition against public officials criticizing a private individual's speech"). That does not convert Gannett's response to that criticism into state action. Some tension between the press and governmental officials has undoubtedly been present throughout our history, *see, e.g., The Trial of John Peter Zenger,* (N.Y. Colony 1735), 17 Howell's St. Tr. 675 (1813), and if mere criticism of the news media by a state official amounted to governmental coercion, First Amendment violations would abound.

■ At any rate, plaintiff appears to base her claim not so much on Gannett's refusal to publish any more of her stories about the D.A.'s Office, but on its alleged efforts to keep her from speaking out about Gannett's "deal" with Relin, and on the alleged retaliation against her for continuing to press the issue with her superiors at the D & C. I find that these allegations also fail to state a claim, for the simple reason that there are no facts alleged that show any nexus between the actions by Gannett and any state actor.

Assuming arguendo that some type of agreement existed, the complaint indicates that the gist of it was simply that Gannett would stop running the stories about problems in the D.A.'s Office. Such a decision is not very remarkable. As stated, Gannett was free to reach such an agreement with Relin, and that alone did not amount to a violation of anyone's First Amendment rights.

Plaintiff asserts that it was implicit in the "deal" that neither Gannett nor Relin would publicly acknowledge its existence, but all that the allegations show is that Gannett did not want plaintiff to speak publicly about it. There are no allegations showing that Relin had any involvement in Gannett's actions to keep plaintiff quiet about the "deal." For that matter, it is not alleged that Relin even *knew* that plaintiff was continuing to press her editors about the existence of the alleged "deal." All that the complaint suggests is that plaintiff's editors decided, on their own, that they had had enough of plaintiff's accusations and innuendoes about the so-called "deal," and that they were going to take steps to punish her or keep her quiet. There are no allegations that Relin was even aware of these events, much less that he was directly involved in them.

The complaint does allege that, prior to the "deal" being struck, Relin contacted plaintiff's editors with a list of names that he suggested they contact concerning those persons' opinions about plaintiff. Complaint ¶ 120. After they did so, the editors told plaintiff that those persons had questioned her objectivity, and this apparently formed part of the basis for Gannett's decision to take plaintiff off the story. Complaint ¶ 127.

Again, though, these events occurred before the alleged "deal" was made. Moreover, the reasonable inference to be drawn from these allegations is simply that Relin was hoping that the editors would share Relin's belief that plaintiff lacked objectivity about the subject of her investigation,

and that both the investigation and the resulting stories should be discontinued. As mentioned, there is nothing pernicious about a public official attempting to dissuade the media from criticizing him. There are no facts alleged indicating that Relin thereafter had a hand in Gannett's treatment of plaintiff, or that he particularly cared what department she worked in or what other types of stories she wrote.[3]

This case therefore stands in sharp contrast to *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993), on which plaintiff relies. In *Dwares,* the Second Circuit sustained a complaint which alleged that: police officers patrolling a demonstration led by "flag burners" told a group of "skinheads," who were opposed to the flag-burners' position, that the officers would permit the skinheads to assault the demonstrators; one of the skinheads informed a local newspaper reporter of the verbal license given by the officers; the skinheads did assault the plaintiff, a demonstrator, in the presence of the officers; and the officers present refrained from interfering with the assault and did not arrest the skinheads.

In *Dwares,* then, the police officers were alleged to have expressly told the skinheads that the officers would stand idly by while the skinheads assaulted the plaintiff (an act which was itself unlawful, even without state action). Here, plaintiff alleges only that Relin complained about the stories concerning his office, Gannett agreed to drop its investigation, and *Gannett* later sought to keep this "deal" under wraps.

There is, then, a gap between the state action that is alleged with respect to Gannett's agreement to drop the investigation into the D.A.'s Office (which, for the reasons already explained, did not violate plaintiff's First Amendment rights) and Gannett's later alleged threats and retaliation against plaintiff for her attempts to expose the existence of what plaintiff viewed as a "deal." Notably absent from the complaint are any allegations that Relin played a part in, or even knew of, the various decisions about reassigning plaintiff to "Our Towns," or the alleged threats to "crush" plaintiff, etc. All that the allegations show is a rapidly deteriorating relationship between plaintiff and her editors because plaintiff continued to press them about a matter that they did not wish to pursue. As an employee, plaintiff had an obligation to heed the wishes of her employer or face the consequences that all employees face when they are insubordinate. Perhaps plaintiff's editors believed that it would have been embarrassing for them, or damaging to their reputations, had plaintiff "gone public" about the "deal," but that does not bear upon the issue of state action.

About the only allegation concerning any continuing cooperation or connection between Relin and Gannett following the "deal" relates to an attorney who had been charged with DWI in Brighton, New York in October 2001. Plaintiff alleges that the D.A.'s Office departed from its usual practice by allowing the attorney to plead to a lesser charge, even though the attorney had refused to take a breathalyzer test. Plaintiff implies that this occurred because

---

**3.** Although plaintiff alleges concerted action by Relin and Gannett to deny plaintiff her First Amendment rights, she has-perhaps tellingly-not sued Relin for that alleged violation. To further illustrate the lack of any connection between Relin and Gannett's treatment of plaintiff, I note that if she had named Relin as

a defendant, based on the allegations of the present complaint any such claim against Relin would be subject to dismissal for lack of personal involvement on his part. *See, e.g., Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001).

the attorney was the then-Chair of Relin's "Permanent Committee to Track and Resolve Felony Cases," which Relin had formed in April 2001 to correct the pending felony problem. Plaintiff also alleges that although an employee of the D & C called the Brighton Town Court about the matter, the D & C never reported the story, presumably (according to plaintiff) as a favor to Relin.

There is no allegation, however, of any direct contacts between Gannett and Relin concerning this story. More to the point, the story itself has only the most tenuous and tangential of connections with Gannett's treatment of plaintiff. The Second Circuit has cautioned that to state a claim under § 1983, a plaintiff cannot rely solely on allegations that "shock but have no meaning." *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987). The allegations about this DWI case would fit precisely into that category, were it not for the fact that they lack even "shock" value.

In short, what is lacking here is the "close nexus between the State and the challenged action" that is required to satisfy the "color of law" requirement. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Plaintiff has raised several sets of allegations concerning Relin's relationship with Gannett, Gannett's decisions about what to publish, and Gannett's subsequent treatment of plaintiff, but has failed to tie them together in a way that shows how Gannett's alleged maltreatment of plaintiff "may be fairly treated as [action] of the State itself." *Id.*

It should also be noted that although the complaint does not appear to use the word "conspiracy," that is in effect what plaintiff alleges. "Conspiracy" in a civil case has been defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir.1996) (quoting *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973)); *accord Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983).

Here, plaintiff has alleged that Gannett and Relin entered into an agreement-or "deal," to use plaintiff's more pejorative-sounding term. According to plaintiff, part of that agreement was that Gannett would stop publishing plaintiff's stories about the problems at the D.A.'s Office, and Gannett took steps to prevent her from speaking out publicly about the "deal" itself. Plaintiff alleges that this was effectively state action because of Relin's involvement, and that it was therefore unlawful-in fact, unconstitutional.

 That is, in effect, an allegation of a conspiracy between a public and a private actor to violate plaintiff's rights. To state a valid § 1983 claim under such a theory, however, a "merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello*, 292 F.3d at 324. Rather, "the complaint must allege facts demonstrating that the private entity acted in concert with the state actor *to commit an unconstitutional act.*" *Id.* (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.), *cert. denied*, 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992)) (emphasis added). Although plaintiff has alleged a host of facts, she has not alleged this crucial element. All she has alleged is that (1) Gannett agreed to stop plaintiff's investigation into, and stories about, problems at the D.A.'s Office, and (2) Gannett threatened and punished her for trying to

speak out about that decision. The former does not implicate plaintiff's First Amendment rights, and the latter cannot fairly be characterized as state action, because there is no allegation that Relin had a hand in those later events.

█ Plaintiff argues that she needs discovery to uncover the exact details of the "deal." Discovery would only be appropriate if plaintiff had stated a claim in the first place, though. *See Jones v. Capital Cities/ABC Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y.1996) ("The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists"). For the reasons stated, I find that plaintiff has not done so, and the Court cannot supply crucial allegations that are missing from the complaint, and then allow plaintiff to engage in a fishing expedition in the hopes of turning up evidence to support those allegations. *See Richards v. Harper*, 864 F.2d 85, 88 (9th Cir.1988) (court will "not supply essential elements of a claim that were not initially pleaded"); *see also Morpurgo v. Board of Higher Educ.*, 423 F.Supp. 704, 713 (S.D.N.Y.1976) ("liberal construction of pleadings should not be permitted to override completely the rights of defendants").

Again, this is not to impose upon plaintiff a burden of pleading more stringent than that of notice pleading as required by Rule 8(a). Even that rule, however, requires a "statement of the claim showing that the pleader is entitled to relief...." In the context of this case, then, there must be some factual allegations of a conspiracy or agreement between Gannett and Relin to commit an unconstitutional act. There are none. Certainly plaintiff *claims* that her constitutional rights were violated, but that is a legal conclusion that the Court need not accept if the facts alleged do not support such a conclusion. *Hickey*, 287 F.3d at 658.

What plaintiff's case ultimately rests on, then, is her allegation that Gannett was a "willful participant in joint activity" with Relin. That allegation fails to support an inference of state action. For one thing, even giving plaintiff's allegations a generous interpretation, the so-called "deal" appears to have been unilateral. Relin complained, and in response, Gannett decided to call a halt to the investigation.

Even if there was some mutual understanding between Gannett and Relin, however, I am not persuaded that every *agreement* between private and state actors amounts to "joint activity" for purposes of § 1983. Gannett may have believed that, by putting a stop to plaintiff's investigation, it was gaining something (such as Relin's continued good will), but Gannett and Gannett alone curtailed the investigation. At any rate, even assuming that there was "joint activity" here, the allegations show that such activity was limited to the halting of the investigation and stories, *not* to Gannett's alleged retaliation against plaintiff.

At bottom, plaintiff's position is tantamount to saying that once Relin expressed his displeasure at the stories about the D.A.'s Office, Gannett *had* to keep running the stories for as long as plaintiff wanted, or risk a lawsuit by her for violating her First Amendment rights. At oral argument, plaintiff's counsel conceded that if plaintiff's editors reached an "independent" decision to stop running the stories, no First Amendment violation would have occurred, but given plaintiff's view of the facts, it is not at all apparent how, once they had spoken to Relin, plaintiff's editors could have reached what she would consider an "independent" decision on the matter. Her position seems to be that if Relin's displeasure played *any* role in her editors' decision in this regard, then that is enough to satisfy the state action require-

ment. That would stretch the concept of state action far beyond reason or the governing case law in this area.

## II. Defendant's Request for Attorney's Fees

Defendants have also requested an award of attorney's fees under 42 U.S.C. § 1988. That request is denied.

A court may award attorney's fees to a prevailing defendant in a § 1983 action if the complaint was "frivolous, unreasonable, or groundless, or ... the plaintiff continued to litigate after it clearly became so." *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986) (internal quotation marks omitted) (quoting *Hughes v. Rowe*, 449 U.S. 5, 15, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam)), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). The Second Circuit has cautioned district courts to be "hesitant" to award such fees, *see Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir.1994).

In the case at bar, although I find the complaint to be meritless, I do not believe that it is frivolous, or so groundless as to warrant a fee award. Given the relative novelty of the issues presented, and the fact that this case has not progressed beyond its earliest stages, I find no basis to award fees to Gannett as the prevailing defendant.

## CONCLUSION

Defendant's motion to dismiss the complaint (Docket # 5) is granted, and the complaint is dismissed.

IT IS SO ORDERED.